UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | |
|---|---|
| **STATE OF KANSAS**, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> **MERRICK GARLAND**, *et al.*, <br><br> Defendants. | Civil Action No. 6:24-cv-01086-TC-TJJ |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR A TEMPORARY RESTRINING ORDER AND PRELIMINARY
INJUNCTION**[1]

---

[1] In compliance with the Court's order in ECF #100, the standing portion of this memorandum is limited to five pages and the merits portion, including the introduction and background, is limited to fifteen pages.  This accounts for the portions of the Introduction relevant to each.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iv

**TABLE OF EXHIBITS** ....................................................................................................viii

INTRODUCTION .............................................................................................................1

BACKGROUND..................................................................................................................1

    A.    Federal Firearms Act of 1938 and Gun Control Act of 1968 ....................................1

    B.    The Firearms Owners' Protection Act ....................................................................2

    C.    The Bipartisan Safer Communities Act ..................................................................3

    D.    The Final Rule .......................................................................................................4

LEGAL STANDARD ...........................................................................................................5

ARGUMENT .......................................................................................................................5

    A.    Plaintiffs Have Standing ........................................................................................5

        1. The States have standing because they are losing tax revenue ......................5

        2. The States have standing because they face increased administrative costs.......................................................................................................................7

        3. Individual Plaintiffs have standing ................................................................7

        4. Plaintiff Chisholm Trail has standing ...........................................................9

    B.    Plaintiffs are Likely to Succeed on the Merits .....................................................10

        1.    The Final Rule is in excess of and contrary to federal law ..................10

            a.    Defendants lack authority to promulgate the Final Rule ........ 10

            b.    The Final Rule violates the text of Federal Law ..................... 12

            c.    The  Final Rule exceeds Defendants' limited authority and violates the major questions doctrine ...................................... 14

        2.    The Final Rule is unconstitutionally vague ...........................................15

        3.    The Final Rule is arbitrary and capricious.............................................17

        4.    The Final Rule violates the Second Amendment ...................................18

C.    The Remining Factors Weigh in Plaintiffs' Favor .................................................19

        1.    The Final Rule irreparably harms Plaintiffs...........................................19

        2.    The balance of the equities and public interest favor Plaintiffs...........19

D.    A TRO and Injunction Should Apply Nationwide. ...............................................20

CONCLUSION...................................................................................................................20

CERTIFICATE OF SERVICE ........................................................................................................... 27

## TABLE OF AUTHORITIES

Cases

*Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12 (D.D.C. 2010)............................................. 5

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020) ...................................................... 20

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023)................................................................................................ 15

*Bittner v. United States*, 598 U.S. 85 (2023) ............................................................................................ 11

*City of Chi. v. Morales*, 527 U.S. 41 (1999) ............................................................................................. 15

*Collins v. Yellen*, 141 S. Ct. 1761 (2021).................................................................................................... 5

*Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972 (D.C. Cir. 1985) ................................................ 5

*D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2020) ............................................................. 20

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ................................................................................. 6

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020)................................... 17

*Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251 (10th Cir. 2024)................................ 19

*Ezell v. City of Chi.*, 651 F.3d 684 (7th Cir. 2011).................................................................................. 18

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)....................................................... 15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S 167 (2000) ...................................... 9

*Guedes v. BAFTE*, 140 S. Ct. 789 (2020)................................................................................................ 12

*Kansas ex rel. Kansas Dep't for Child. & Fams. v. SourceAmerica*, 874 F.3d 1226 (10th Cir. 2017) .......... 19

*Leocal v. Ashcroft*, 543 U.S. 1  (2004) ..................................................................................................... 12

*Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. 2023) ..................................................... 18

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)................................................... 18

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) ................................................................. 10

*Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir. 1998) ................................. 20

*Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022)................................................................................. 20

*New York v. Yellen*, 15 F.4th 569 (2d Cir. 2021) ................................................................................... 5

*Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) ........................................................................ 18

*Sackett v. EPA*, 566 U.S. 120 (2012) ................................................................................................... 9

*StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023) ................................................ 15

*Susan B. Anthony v. Driehus*, 573 U.S. 149 (2014) .............................................................................. 9

Temp. Restraining Ord., *Texas v. ATF*, Case no. 2:24-cv-89-z (May 19, 2024) ............. 6, 12, 13, 14

*Texas v. United States*, 787 F.3d 733 (5th Cir. 2015).............................................................................. 7

*Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023) ...................................................................................... 5

*United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669 (1973) ...................... 6

*West Virginia v. EPA*, 597 U.S. 697 (2022) ......................................................................................... 15

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001) .......................................................................... 15

Statutes

18 U.S.C § 921(a)(22) ........................................................................................................................ 14

18 U.S.C. § 921 ............................................................................................................................. 3, 12

18 U.S.C. § 921(a)(11)......................................................................................................................... 2

18 U.S.C. § 921(a)(11)(A) ................................................................................................................. 11

18 U.S.C. § 921(a)(13) ...................................................................................................................... 11

18 U.S.C. § 921(a)(21)(C) ................................................................................................. 4, 13, 14, 16

18 U.S.C. § 922(a)(1) ....................................................................................................................... 14

18 U.S.C. § 922(t)(1)(A) ............................................................................................... 8

18 U.S.C. § 923 ............................................................................................................ 14

18 U.S.C. § 923(d)(1)(E) ............................................................................................... 8

18 U.S.C. § 923(g)(1)(A) ............................................................................................... 8

18 U.S.C. § 923(g)(1)(B)(i) ........................................................................................... 8

18 U.S.C. § 923(g)(1)(B)(ii)(I) ...................................................................................... 8

18 U.S.C. § 926(a) ....................................................................................................... 11

18 U.S.C. 921(a)(11)(A) .............................................................................................. 14

5 U.S.C. § 705 .............................................................................................................. 5

5 U.S.C. § 706(2) ........................................................................................................ 20

5 U.S.C. § 706(2)(C) ................................................................................................... 10

Tenn. Code Ann. § 39-17-1316 ..................................................................................... 7

### Other Authorities

Joan Burbick, *Cultural Anatomy of a Gun Show*, 17 Stan. L. & Pol'y Rev. 657 (2006) ....................... 18

John Berrigan, Deborah Azrael, and Matthew Miller, "*The Number and Type of Private Firearms in the United States*," Sage Journals, Table 2 ................................................................. 13, 16

### Regulations

18 C.F.R. § 478.102(a) .................................................................................................. 8

18 C.F.R. § 478.124(a)-(b) ............................................................................................. 8

27 C.F.R. § 478 ........................................................................................................... 17

27 C.F.R. § 478.11 ....................................................................................................... 16

27 C.F.R. § 478.13 ....................................................................................................... 17

Kan. Admin. Regs. § 92-19-22a(4) ................................................................................. 6

Acts of Congress

The Bipartisan Safer Communities Act of 2022, Pub. L. Section 3 of 117-159, 136 Stat. 1313 (2022)

.................................................................................................................. 3, 4, 15

The Federal Firearms Act of 1938, Pub. L. 75-785, 52 Stat. 1250 (June 30, 1938)........................... 1

The Firearm Owners Protection Act of 1986, Pub. L. 99-308, 100 Stat. 449 (May 19, 1986) .... 3, 11

The Gun Control Act of 1968, Pub. L. 90-168, 82 Stat. 1213 (Oct. 22, 1968) .................................. 2

Congressional Record

S. Rep. No. 98–583 (1984)............................................................................................................. 3

*The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution, Sen. Jud. Comm.,

97th Cong., 2d Sess. (1982) ......................................................................................... 2

**TABLE OF EXHIBITS**

| Exhibit Number | Exhibit Name | Page Numbers |
| --- | --- | --- |
| Exhibit 1 | Chipley Declaration | 6, 16, 19 |
| Exhibit 2 | Kehril Declaration | 6, 10, 17, 18, 19 |
| Exhibit 3 | Temporary Restraining Order, *Texas v. ATF*, Case no. 2:24-cv-89-z at 5–8 (May 19, 2024) | 6, 9, 12, 13, 14 |
| Exhibit 4 | Journey Declaration | 7, 8 |
| Exhibit 5 | Black Declaration | 8 |
| Exhibit 6 | Maxey Declaration | 8 |
| Exhibit 7 | Fry Declaration | 9, 10 |
| Exhibit 8 | Edwards Declaration | 7 |
| Exhibit 9 | Fanning Declaration | 6 |
| Exhibit 10 | Mayer Declaration | 6 |
| Exhibit 11 | Francis Declaration | 6 |

## INTRODUCTION

The Second Amendment preserves treasured rights rooted deeply in our nation's history and tradition. Accordingly, Congress has always been careful when addressing regulation of firearms, including firearms commerce. It has been especially careful in how much authority it delegates to the executive branch. In adopting the Final Rule,[2] Defendants exceeded their statutory authority, blatantly violating both the statute they claim to interpret and the Constitution itself. Under the Final Rule, Defendants attempt to change the definitions set by Congress so they can regulate any citizen who makes a local sale of even one firearm to another individual. The Final Rule is unlawful, and its implementation is causing irreparable harm to all Plaintiffs. Plaintiffs respectfully ask the Court to grant a temporary restraining order and a preliminary injunction.

## BACKGROUND

**A.**   **Federal Firearms Act of 1938 and Gun Control Act of 1968**

For the first 150 years of our nation's history, there was no significant regulation of firearms commerce. The first licensing requirement for firearms dealers took place when Congress enacted the Federal Firearms Act of 1938 ("FFA"), Pub. L. 75-785, 52 Stat. 1250, 1251 (June 30, 1938), which required

> [a]ny . . . dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce" to apply for a license with "the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application.

The license "entitle[d] the licensee to transport, ship, and receive firearms . . . in interstate . . . commerce." 52 Stat. at 1251. As relevant here, the FFA defined a "dealer" as "any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellent powder, at wholesale or retail." 52 Stat. at 1250.

---

[2] *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 F.R. 28968 (Apr. 19, 2024).

In 1968, Congress passed the Gun Control Act ("GCA").[3] The GCA sought to prevent "crime and violence" without "intending to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." 82 Stat. at 1213-14. The GCA defined definition of "dealer" largely tracked the FFA's definition: "any person engaged in the business of selling firearms or ammunition at wholesale or retail." 82 Stat. at 1216.[4]

**B.      The Firearms Owners' Protection Act**

ATF was accused of utilizing questionable techniques to generate arrests after the GCA. These cases led to congressional hearings in late 1979 and early 1980.[5] The report of the Senate Subcommittee on the Constitution concluded as follows: (1) The "enforcement tactics made possible by current federal firearms laws are constitutionally, legally and practically reprehensible." *Id.;*(2) The Subcommittee found that ATF had "primarily devoted its firearms enforcement efforts to the apprehension, upon technical malum prohibitum charges, of individuals who lack all criminal intent and knowledge." *Id.*; (3) The Subcommittee also found that ATF "[a]gents anxious to generate an impressive arrest and gun confiscation quota [had] repeatedly enticed gun collectors into making a small number of sales—often as few as four—from their personal collections," even though each of the sales "was completely legal under state and federal law." *Id.* ATF still "charged the collector with having 'engaged in the business' of dealing in guns without the required license," which saddled "numerous collectors ... [with] a felony record carrying a potential sentence of five years in federal prison" even though many had "no criminal knowledge or intent." *Id.*

---

[3] Pub. L. 90-168, 82 Stat. 1213 (Oct. 22, 1968).

[4] *Codified at* 18 U.S.C. § 921(a)(11).

[5] *The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution, Sen. Jud. Comm., 97th Cong., 2d Sess., at 20 (1982).

Congress passed the Firearm Owners Protection Act ("FOPA")[6] to correct those abuses. *See also* S. Rep. No. 98–583, at 6 (1984). In so doing, Congress found: (1) "the rights of citizens . . . require additional legislation to correct existing firearms statutes and enforcement policies." 100 Stat. at 449[7]; and (2) "additional legislation is required to reaffirm the intent of the Congress, as expressed in section 101 of the [GCA]." *Id.* So, the FOPA clarified that "it is not the purpose of this title to place undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of personal protection, or any other lawful activity." *Id.* And the FOPA "is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes.'" *Id.*

The FOPA narrowed the definition of "dealer" by defining "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 100 Stat. at 450. But the FOPA excluded "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.* It also narrowed the definition of "dealer" by defining "with the principal objective of livelihood and profit" as intending "the sale or disposition of firearms is predominantly [to] obtain livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.*

**C.    The Bipartisan Safer Communities Act**

In 2022, Congress passed a narrow amendment to the GCA in the Bipartisan Safer Communities Act ("BSCA").[8] The BSCA amended "dealer: by replacing "with the principal objective of livelihood and profit" with "to predominantly earn a profit," § 12002, 136 Stat.

---

[6] Pub. L. 99-308, 100 Stat. 449 (May 19, 1986)

[7] *Codified at* 18 U.S.C. § 921 Note.

[8] Pub. L. Section 3 of 117-159, 136 Stat. 1313 (2022).

at 1324,  and defining "to predominantly earn a profit" as an "intent underlying the sale or disposition of firearms [that] is primarily one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection," *id.* at 1325.  The BSCA did not alter the requirement for a "regular course" of trade involving "repetitive" transactions of "firearms."

**D.**     **The Final Rule**

The Final Rule uses the statutory tweak in the BSCA as a pretext for creating an entirely different definition of what it means to be "engaged in the business" of a firearms dealer. The Final Rule states "even a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license." 89 F.R. 28976, 29091. In addition to redefining already-defined statutory terms, the Final Rule creates a series of five presumptions—three of which are explicitly multipart—any one of which ATF can use to presume someone is dealing in firearms. *See* 89 F.R. 29091. Indeed, the Final Rule has exceptions to those presumptions that have their own exceptions. *See id.* This results in a nebulous web of presumptions and exceptions that makes it nearly impossible to identify who and what conduct is covered.

18 U.S.C. § 921(a)(21)(C) excludes someone from being "engaged in the business" if that person "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." But the Final Rule purports to (re)define this unqualified exception via its definition of the term "personal collection" as "[p]ersonal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit. . . . In addition, *the term shall not include firearms*

4

*accumulated primarily for personal protection.*" 89 F.R. 29090 (emphasis added). It also states that if someone "restocks" their personal collection after selling a firearm they may not qualify for the exemption for selling from a personal collection. *Id.* at 29092.

The Final Rule anticipates several effects on those who sell firearms without a license. The first is that a significant number of them will become federal firearms licensees and abide by the new regulations. *Id.* at 29898. A second anticipated effect is that there will be many individuals that stop selling firearms altogether. *Id.* at 29,054. The Final Rule estimates that number at 2.5–10%. *Id.* The Final Rule took effect May 20, 2024. *Id.* at 28968.

## LEGAL STANDARD

The APA allows "the reviewing court" to issue "all necessary and appropriate process" to delay "an agency action or to preserve status or rights pending conclusion of review proceedings." 5 U.S.C. § 705.   All four of the standard factors for a preliminary injunction and temporary restraining order weigh in favor of such relief here.

## ARGUMENT

### A.    Plaintiffs Have Standing

"If at least one plaintiff has standing"—here, that would mean one valid theory of standing for even one State or private party—the suit should "move forward." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023); *see also id.* ("we need not consider the other theories of standing").

### 1. The States have standing because they are losing tax revenue

The States have already lost (and will continue to lose) tax revenue under the Final Rule. Monetary loss is a cognizable harm. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023) ("pocketbook injur[ies]" confer standing); *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021); *New York v. Yellen*, 15 F.4th 569, 576 (2d Cir. 2021) (noting that "specific lost tax revenues suffice to support standing" and differ from "allegations of generalized economic harm only"). Loss of revenue caused by a federal agency is an injury to the States that is traceable to Defendants. *See Dep't of Com. v. New York*, 139 S.

Ct. 2551, 2565 (2019). Just as New York had standing in that case, so too do the States here.[9]

Many of Plaintiff States tax tables at gun shows, sales of firearms, or admissions to gun shows. Kansas, for example, collects a 6.5% sales tax both for admissions and for sale of firearms during gun shows. Kan. Admin. Regs. § 92-19-22a(4); *see also* Complaint at 19–23 (ECF #1) (listing state tax laws); Ex. 9; Ex. 10; Ex 11. The loss of tax revenue at gun shows is not speculative; it has already occurred and will continue to occur every week until a temporary injunction is in place. Because of the Final Rule, the number of unlicensed sellers at gun shows has already dropped dramatically—by an estimated 30-40% (not the 10% predicted by Defendants). *See* Ex. 1 ¶ 3; Ex. 2 ¶ 2. In the Plaintiff States, collectively, an average of ten gun shows are scheduled to occur each weekend.[10] In addition, at least five gun shows have been cancelled entirely, as a direct consequence of the Final Rule. In May, June, and July, shows in Hamilton, Montana;[11] Athens and Sparta Tennessee, Ex. 1 ¶¶ 18, 21; and Murfreesboro, Tennessee, and Broken Arrow, Oklahoma, Ex. 2 ¶¶ 12, 15, were also canceled because of the Final Rule. When cancellation occurs, a state collects no tax revenue. For example, the Athens show generated over $2,600 in state sales taxes in 2023. Ex. 1 ¶ 20. In 2024, zero taxes were collected. The cancelation in Murfreesboro has cost Tennessee over $1,500. Ex. 2 ¶ 13. There is no minimum amount of tax revenue that must be lost. "[A]n identifiable trifle is enough for standing . . . ." *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 690 n.14 (1973). As a judge in the Northern District of Texas has already found, the States have clearly established an injury to their State fiscs that they will not face if the Final Rule is stayed and later vacated. *See* Temp. Restraining Ord., *Texas v. ATF*, Case no. 2:24-cv-

---

[9] Go to a Gun Show! The BIG 2024 Gun Shows List, Gun Show Trader, (last accessed Jun. 4, 2024) https://gunshowtrader.com/gun-shows. Information found by clicking on the calendar of gun shows in each respective state.

[10] Eleven on June 8–9, nine on June 15–16, ten on June 22–23. *See* https://gunshowtrader.com/gun-shows/page/2/.

[11] News Release: *MT Gun Show Cancelled–BATFE Regulation*, Montana Shooting Sports Association (last accessed Jun. 5, 2024), https://www.mtssa.org/mt-gun-show-cancelled-batfe-regulation/ (shows canceled "because of the new regulation by the Biden administration and the [ATF] redefining what 'engaged in business' is for selling one or more firearms").

89-z at 5–8 (May 19, 2024) (attached as Ex. 3).

**2. The States have standing because they face increased administrative costs**

The States have also established standing because, as Defendants admit, the Final Rule will impose additional administrative costs. Plaintiffs Tennessee and New Hampshire tie their own background checks to the federal requirements. *See* Tenn. Code Ann. § 39-17-1316; Ex. 8 at 2–3.  The Final Rule anticipates an increase in the number of federal firearms licensees across the country. 89 F.R. 28998. It also expects an increase in background checks and notes that it is state law enforcement agencies in Tennessee that conduct these background checks. *Id.* at 29088. This will result in an increase in administrative costs for Tennessee and New Hampshire as they process more firearms license applications and run background checks for new licensees that previously did not need to do so. *See* Ex. 8 at 2–3. Once these costs are incurred, they can't be clawed back, causing an injury. The States are also harmed if they are forced to change their laws to *avoid* irreparable injury. *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015), *aff'med by an equally divided Court* 579 U.S. 547 (2016).

**3. Individual Plaintiffs have standing**

Plaintiff Journey attends four to five gun shows a year and buys or sells firearms at most of them. Ex. 4 ¶ 4. Journey owns firearms for self-defense, and he sells firearms for various reasons. *Id.* ¶¶ 3, 4. As he noted, the Final Rule could require him to obtain a federal firearm license ("FFL") if he engages in "even a single firearm transaction or offer to engage in a transaction." *Id.* ¶ 25 (quoting 89 F.R. 29091). So, if the Final Rule is allowed to take effect, Journey "believe[s] that [he] will have to give up selling firearms or register as [a licensee]." *Id.* ¶ 10. This will have an immediate impact on him because he intends to attend gun shows (where he intends to buy and sell firearms) in July, October, and November, and the license application process is burdensome and takes several months to complete. *Id.* ¶¶ 4, 10.2. He is harmed regardless of whether he is forced to unnecessarily apply for a license or he skips the shows. There is a realistic danger that he will be subject to penalties, and his injury is certainly impending.

Black likewise attends multiple gun shows a year where he buys and sells firearms. Ex. 5

¶ 4. He has reviewed the Final Rule and believes that it applies to him and his purchases and sales—a supposition he is better suited to make at this time than Defendants. *Id.* ¶¶ 6, 8. If the Final Rule is allowed to take effect, he will either need to register as a licensee, which is a burdensome and time-consuming process, or stop buying and selling firearms altogether. *Id.* ¶¶ 7, 8. He is concerned that if he does not do so, an otherwise perfectly legal sale or offer to sell will put him at risk of "civil, administrative, and possibly criminal penalties." *Id.* ¶ 13. Maxey attends three gun shows a year and regularly purchases firearms. Ex. 6 ¶ 4. He is aware that the Final Rule will decrease the number of people who sell firearms at gun shows. *Id.* ¶¶ 8–10. This will impact his constitutional and statutory rights to acquire firearms.

Individual Plaintiffs do not want to become licensees. Becoming a licensee is a cumbersome process that takes months and costs $200.[12] By the time a license is approved (if it is), Individual Plaintiffs will have had to decide whether to attend upcoming gun shows (and risk enforcement) or decline to exercise their Second Amendment rights. Once someone has a license, there are extensive obligations and burdens. *See, e.g.*, 18 U.S.C. §§ 923(g)(1)(A); 923(g)(1)(B)(ii)(I); 923(d)(1)(E); 922(t)(1)(A); 18 C.F.R. § 478.102(a); *see also id.* § 478.124(a)-(b). And he is subject to warrantless record inspections if he becomes involved in a criminal investigation. *See* 18 U.S.C. § 923(g)(1)(B)(i).

All three Individual Plaintiffs reasonably believe the Final Rule applies to conduct they regularly (and legally) engage in. Among other things, all three sell and buy firearms for personal protection, which is excluded from the definition of "personal collection" in the Final Rule. All three individuals attend multiple gun shows a year, which may or may not constitute "occasional" sales under the Final Rule, because it does not define the term and because it suggests even one sale (or contemplated sale) is sufficient to qualify someone as "engaged in the business." *See* 89 F.R. 29091.

Individual Plaintiffs do not need to declare an intent to break the Final Rule in order to

---

[12] *Apply for a License*, ATF (last accessed Jun. 6, 2024), https://www.atf.gov/firearms/apply-license.

challenge it. Their simple desire to do something in the future that could result in prosecution is sufficient to establish a "cognizable injury" for the purposes of standing, especially when they have established a specific date in the future or plan to do the prohibited thing. *Susan B. Anthony v. Driehus*, 573 U.S. 149, 161 (2014). Individual Plaintiffs must simply establish "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Id.*; *see also Sackett v. EPA*, 566 U.S. 120, 127 (2012). Individual Plaintiffs have articulated in their declarations a desire and intent to do the very thing in the future that has been prohibited by the Final Rule (sell firearms multiple times a year without an FFL). This "cognizable threat" of potential prosecution based on the potential future conduct of Individual Plaintiffs is enough to refute the government's claim on this front. Individual Plaintiffs face a realistic, imminent threat of danger or else are chilled from exercising their Second Amendment rights. They have standing. *See* Ex. 3 at 5-8.

**4. Plaintiff Chisholm Trail has standing**

Plaintiff Chisholm Trail also has standing. Both Plaintiffs Maxey and Black are members of Chisolm Trail, *see* Ex. 7 at 2, and both have standing. Both Plaintiffs declared that they own, sell, or purchase firearms repeatedly throughout the year. The firearms that Black and Maxey sell and purchase can be used for personal protection, and thus fall within the ambit of the Final Rule. Black and Maxey's activities relate to the purpose of the organization, *see id.* at 2–3, and, therefore, it has standing. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S 167, 181 (2000).

Chisolm Trail's injuries are concrete and particularized. In his declaration, Jim Fry outlined how approximately 70% of Chisholm Trail's annual operating expenses are covered by revenue generated by the biannual gun shows they organize. Ex. 7 at 2. Since private party sales of firearms are what dominate these gun shows, the Final Rule will drive down attendance and revenue for the organization (because there will be fewer people willing to risk selling a firearm without becoming a licensee). In the weeks that the Final Rile has been in effect, there has been a drop of 30% in the number of unlicensed vendors at gun shows. Ex. 2 ¶ 10. Last fiscal year, Chisholm Trail paid sales tax to Kansas for table rental fees charged during their gun shows in the

amount of $4,005.72. Ex. 7 at 3. So, the loss of even a relatively small amount of the revenue generated by these gun shows would cause financial harm to both Chisholm Trail and Kansas in the form of tax revenue. So, Chisolm Trail also has standing.

**B.    Plaintiffs are Likely to Succeed on the Merits**

**1.    The Final Rule is in excess of and contrary to federal law**

Defendants have no authority to issue the Final Rule. But even if they did, they can't redefine Congressionally defined terms.

**a.    Defendants lack authority to promulgate the Final Rule**

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Congress expressly limited how much authority to grant Defendants in issuing regulations and allowed them to "prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter." *See* 18 U.S.C. 926. Because Chapter 44 of Title 18 ("federal firearms law") gives ATF no statutory authority to redefine terms or to create rebuttable presumptions in the federal firearms law, those portions of the Final Rule must be set aside.[13] *See, e.g., Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022).

The ATF Director's statutory authority is circumscribed in 18 U.S.C. § 926(a), which explains that he "may prescribe only such rules and regulations as are necessary to carry out the [law's] provisions." *Id.* Congress's intentionally limited this authority to "only . . . necessary" rules and regulations. As discussed, *supra*, Congress specifically limited Defendants delegated authority.

There is another indication in the statutory text that Congress did not delegate

---

[13] The Final Rule redefines "dealer," "engaged in the business," "principal objective of livelihood and profit," and it adds definitions for "personal collection (or personal collection of firearms, or personal firearms collection)," "former licensee inventory," "predominantly earn a profit," "responsible person," and "terrorism." *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 F.R. 28968, 29089–90.

authority to the Director to redefine statutory definitions in the Final Rule. The statutory definition part of section 921(a) grants the Director rulemaking authority to define only the term "curios and relics." *See* 18 U.S.C. § 921(a)(13).[14] The Director is not authorized to promulgate any rules to define statutory terms. And there is absolutely no authority for the idea that Congress gave the Director authority to define "personal collection" to exclude those acquired for "personal protection," the most common type of firearm. No other part of § 921(a) authorizes the Director to promulgate any rules to define statutory terms. *See id.* (use of "particular language in one section of a statute" paired with "omi[ssion] from a neighbor[ing provision]," "normally . . . convey[s] a difference in meaning (*expressio unius est exclusio alterius*)"). *See Bittner v. United States*, 598 U.S. 85, 94 (2023). So too here. The express grant of authority to the Director to define some terms strongly suggests Congress withheld that same authority for other terms.

Nor are the changed definitions in the Final Rule "necessary." *See* 18 U.S.C. § 926(a). Before the BSCA, the statute defined a "dealer" as a person "engaged in the business" of selling firearms, *see id.* § 921(a)(11)(A), and further defined "engaged in the business" as "a person who devotes time, attention and labor to dealing in firearms as a regular course of trade or business with *the principal objective of livelihood and profit* through the repetitive purchase and sale of firearms," *see* FOPA, 100 Stat. 449, 450 (emphasis added). It defined "with the principal objective of livelihood and profit" as an "intent . . . [that] is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* Further, it certainly wasn't "necessary" to carve out "personal protection" firearms.

In addition, ATF lacks authority to create presumptions as to whether someone is "engaged in the business." *See* 18 U.S.C. §§ 921–34. That the Final Rule's presumptions apply to a

---

[14] Even this limited grant of authority was later restricted in a spending prohibition. *See* Pub. L. 113-6, 127 Stat. 198, 248 (Mar. 26, 2013) ("[I]n the current fiscal year and any fiscal year thereafter, no funds appropriated under this Act shall be used to pay administrative expenses or the compensation of any officer or employee of the United States to . . . change the definition of 'Curios or relics' in § 478.11 of title 27 . . . .") (*codified at* 18 U.S.C. § 921).

*criminal statute* only reinforces this. ATF claims the presumptions would not apply in criminal proceedings, but it still concedes that the presumptions "may be useful to a court." *See* 89 F.R. at 28976, 29011, 29014. Regardless, the Final Rule's meaning must be the same in civil and criminal contexts. *See Leocal v. Ashcroft*, 543 U.S. 1, 11–12 n.8 (2004). Because the statute has criminal applications, ATF's construction of it—through presumptions to define covered conduct—is entitled to no deference, *Guedes v. BAFTE*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in the denial of *certiorari*). ATF has exceeded its authority by redefining statutory provisions and creating rebuttable presumptions in the Final Rule that it has no authority to promulgate.

**b.      The Final Rule violates the text of Federal Law**

The Northern District of Texas has correctly held "the Final Rule clashes with the text of the BSCA in at least three ways." Ex. 3 at 9. This Court should do the same. These clashes with the terms of federal law are obvious and can't be reconciled with the its text.

*"Repetitive" sales of multiple "firearms."*    First, the Final Rule violates the statute's requirement that there be "repetitive" sales of multiple "firearms." The Final Rule claims that there is no "minimum number of firearms to actually be sold to be 'engaged in the business.'" 89 F.R. 29021.  "[A] single firearm transaction"—or even a mere offer to sell a firearm when combined with other evidence—"may be sufficient to require a license." *Id.* at 28976. The Final Rule flatly contradicts the statutory text. As explained in *Texas*, "Defendants' proffered interpretation is severely undercut by Section 921(a)(21)(C)'s use of [] 'firearms,' in the plural." Ex. 3 at 9. And there's more. "Section 921(a)(21)(C) require[s] the 'purchase *and* resale' of firearms—a conjunctive requirement that flatly contradicts Defendants' assertion that 'there is no minimum threshold number of firearms purchased *or* sold" to require a license. *Id.* at 9-10 (emphases original) (quoting 89 F.R. 29091).

*The "personal protection" exclusion.* Second, the Final Rule invents an exclusion of firearms "for personal protection" that is found nowhere in federal law. Federal law creates a safe harbor that excludes a person from being "engaged in the business" if he

"make[s] occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby," or if he "sell[s] all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C) (cleaned up). Congress did not delegate authority to Defendants to redefine "personal collection," *see* 89 F.R. 28971, but they did so anyway, *see* 89 F.R. 29090. The Final Rule redefines this unqualified "personal collection" exception by excluding "*any firearm* purchased for the purpose of resale with the predominant intent to earn a profit" and "firearms accumulated *primarily for personal protection*." 89 F.R. 29090 (emphases added). As the court in the Northern District of Texas correctly held, in so doing, the Final Rule "arbitrarily eviscerates Section 921(a)(21)(C)'s safe harbor provision." Ex. 3 at 11. Nothing in the statute's text warrants excluding firearms obtained for personal protection from the statutory term "personal collection." Indeed, *Heller* expressly recognized that personal protection is "central to the Second Amendment right" and a primary reason that individuals acquire firearms for personal use. *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008). Additionally, this would likely apply to almost all handguns (44% of firearms in private possession[15]) and shotguns (20%[16]). Finally, if one includes rifles as firearms usable for personal protection—which virtually every rifle is—then every functioning firearm in the country is excluded from Defendants' arbitrary definition of "personal collection." They cannot point to any authority for this absurd result.

*"Proof of profit."* The Final Rule claims that "actual profit is not a requirement of the statute—it is only the predominant intent to earn a profit though the repetitive purchase and resale of firearms that is required." 89 F.R. 29091. The Final Rule misconstrues the statute, which states: "The term 'to predominantly earn a profit' means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and

---

[15] 145,027,290 out of a total of 325,974,664. John Berrigan, Deborah Azrael, and Matthew Miller, "*The Number and Type of Private Firearms in the United States*," Sage Journals, Table 2, *available at* https://journals.sagepub.com/doi/full/10.1177/00027162231164855.)

[16] 65,384,747 out of a total of 325,974,664, *Berrigan, et al.*

disposition of firearms for *criminal purposes or terrorism*." 18 U.S.C § 921(a)(22) (emphasis added). As the court in *Texas* pointed out, "the negative corollary is obvious: while proof of profit is not required 'for criminal purposes or terrorism,' it is required for all other cases." Ex. 3 at 10.

**c.  The Final Rule exceeds Defendants' limited authority and violates the major questions doctrine**

Federal law regulates the interstate firearms industry by imposing licensing requirements on firearms importers, manufacturers, and as relevant here, dealers. *See* 18 U.S.C. § 923. Any person who wishes to "engage in the business of . . . dealing in firearms" must obtain a federal firearms license. *See id.* § 923(a) (cleaned up); *see also id.* § 922(a)(1). The statutory definitions show federal firearms laws' focus on commercial firearms operations. It defines "dealer" as "any person engaged in the business of selling firearms at wholesale or retail." *Id.* § 921(a)(11)(A). It then defines "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms *as a regular course of trade or business* to predominantly earn a profit through the *repetitive purchase and resale* of firearms." *Id.* § 921(a)(21)(C) (emphases added). Status as a "dealer" is thus tailored to capture commercial firearms operations. *See id.* To meet the statute's definition of "dealer," a person must devote significant time to the commercial selling and reselling of firearms at routine intervals—periodic or irregular sales don't suffice. Federal firearms law never intended to impose dealer requirements on those making small-scale and infrequent sales. Nor does it authorize ATF to use these sales as a backdoor to impose universal background checks.

Defendants latch onto the BSCA's minor amendment to smuggle universal background checks in the back door. But nothing in the BSCA's recent amendment hints that Congress retrained its focus on local sales. The BSCA amended the FOPA's definition of "engaged in the business" but it otherwise left section 921(a) untouched.[17] The BSCA

---

[17] *See* Pub. L. No. 117-159, § 3(b), div. A, tit. II, § 12002, 136 Stat. 1313, 1324–25 (June 25, 2022).

replaced FOPA's definition of "with the principal objective of livelihood and profit" with "to predominantly earn a profit" and defined "predominantly earn a profit" as an intent that is "predominantly one of obtaining pecuniary gain"—a near carbon copy of the FOPA's definition. 136 Stat. at 1324–25.

Universal background checks are a hotly contested political issue and a "major question." *See West Virginia v. EPA*, 597 U.S. 697, 721–22 (2022); *Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023). Decisions on "major questions" must be made by "Congress itself, or [by] an agency acting pursuant to a clear delegation from that representative body." *West Virginia*, 597 U.S. at 735. A "colorable" or "plausible" textual basis won't do. *Id.* at 723; *see also Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). But if Congress intended the BSCA's benign changes to authorize ATF to resolve these contentious issues, "common sense" suggests it would have done so plainly. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Congress wasn't unclear; it didn't delegate this authority *at all*.

**2.    The Final Rule is unconstitutionally vague**

A regulation is unconstitutionally vague if it does not give a person of reasonable intelligence fair notice that his conduct is unlawful or it "fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chi. v. Morales*, 527 U.S. 41, 52, 60 (1999). The Final Rule is confusing and susceptible to multiple interpretation; as such, it "encourages arbitrary and discriminatory enforcement." *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023). The three greatest sources of vagueness created by the Final Rule are: (1) the invention of a new distinction between guns used for personal protection and guns not used for personal protection, (2) the creation of a new standard that the mere suggestion of a willingness to sell a *single* firearm *may or may not* be enough to bring someone within the scope of being engaged in the business, and (3) the mind-numbing complexity of the rule itself, with its exceptions to exceptions and its multiple presumptions.

**First, the phrase "primarily for personal protection" is inherently vague.**  This phrase is a completely new legal standard invented by Defendants. It appears in the Final Rule's

definition of the term "personal collection," with the full sentence reading: "In addition, the term shall not include firearms accumulated primarily for personal protection." 27 C.F.R. § 478.11. However, as discussed *supra*, *virtually every firearm* can be used for personal protection: handguns, shotguns, and rifles. It is beyond cavil that every handgun is useful for personal protection. Berrigan, *et al*., Table 2. Shotguns are also ideal for personal protection—particularly personal protection in one's home. *Id*. The only category about which reasonable debate might occur is the rifle category. So which guns were "accumulated primarily for personal protection?" It is impossible to say with certainty. No gun buyer fills out a form when purchasing a firearm that requires him to state his intend use of the firearm. And it would be difficult to do so even if such a form existed. Most gun buyers have *multiple* purposes in mind.[18]

**Second, it creates vagueness as to how many firearms must be sold.** The wording of the Final Rule exudes vagueness: "[T]here is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms. Even "a single firearm transaction or offer to engage in a transaction, when combined with other evidence . . . may require a license." 27 C.F.R. § 478.13. This stands in contrast to the wording of federal law prior to the issuance of the Final Rule. The wording of the law is fairly easy to understand: a person is "engaged in the business" through "the repetitive purchase and resale of firearms," but not through "occasional sales, exchanges, or purchases" of guns in a "personal collection." 18 U.S.C. § 921(a)(21)(C). So, put simply, the law indicates that lots of repetitive sales constitute being "engaged in the business," and a few "occasional" sales are not enough. The Final Rule changes all of that, with the *potential* sale of single firearm *maybe* being enough. According to one of the largest

---

[18] For example: .25 ACP caliber semi-automatic pistols are extremely small handguns were widely sold in the United States in the 1950s, 1960s, and 1970s. Now, none of the major firearm companies manufactures them, mainly because the small .380 caliber has become more popular. They have consequently increased in value. Suppose a person acquired a few .25 ACP pistols in the 1960s mainly for personal protection. Now they are collectors' items. Without an FFL, he decides to sell them at a profit, and he restocks his personal collection with newer handguns. Did he "accumulate" the .25 ACP pistols for personal protection? The Final Rule is too vague for any reasonably intelligent person to know and for any ATF agent to enforce fairly.

gun show organizers in the country, "If you talk to five different ATF agents about what the Final Rule covers, you will likely get five different answers." Ex. 2 ¶ 8.

**Third, the Byzantine complexity of the Final Rule itself creates vagueness**. The Final Rule contains multiple exceptions and multiple presumptions. And the multiple presumptions are accompanied by multiple opposing presumptions that serve as exceptions to the presumptions. *See generally* 27 C.F.R. § 478.13.[19] A person of ordinary intelligence cannot easily comprehend exactly what conduct is prohibited.

**3.      The Final Rule is arbitrary and capricious**

An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation, fails to address alternatives to its action, or when it ignores affected communities' reliance on the prior rule. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). The Final Rule departs sharply from prior practice. Previously, Defendants adopted the statutory definition of terms such as "engaged in the business," rather than expanding those definitions beyond what Congress included. *See* 27 C.F.R. § 478. This radical change has "caused great fear and confusion" among gun show sellers, causing approximately 30% to stop selling altogether. Ex. 2 ¶¶ 9, 10. This departure is arbitrary. The arbitrary exclusion of firearms acquired for personal protection from "personal collection[s]" can't be attributed to a difference in view or experience. It's from thin air.

Because Congress already defined these terms, Defendants' new definition can't be ascribed to a difference in view or product of agency experience. And the other explanations for the Final Rule aren't reasonable either. The Final Rule nods toward "new technologies, mediums of exchange, and forums in which firearms are bought and sold." 89 F.R. 28973. But it doesn't limit

---

[19]For example, the Final Rule claims to uphold a statutory exemption by not presuming someone selling firearms from their personal collection is a dealer. At the same time, the Final Rule creates the following exceptions to the exception to that presumption: (1) a personal collection doesn't include firearms purchased for self-defense, (2) includes no firearm that was brought with any intent to obtain profit, and (3) includes no one who buys any other firearms after selling from their personal collection. *Id.* at 29068–69.

itself to those new forums. It mostly targets gun shows which have been around since at least 1895.[20] "Clarity" and "emerging technologies" only existed to serve as a pretext for what Defendants wanted to do, which was establish near-universal background checks through the rulemaking process after they failed to pass this requirement through Congress. Defendants can't use an implausible pretext to impose them. Consequently, it is arbitrary and capricious.

**4.     The Final Rule violates the Second Amendment**

The Final Rule also violates the Second Amendment.  In the landmark *Bruen* decision, the Supreme Court succinctly stated the test for a law or rule's constitutionality.  "We reiterate that the standard for applying the Second Amendment is as follows:  When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022). So, the first half of the test is the text, the second half is the history.

Plaintiffs unquestionably satisfy the first half of the test, which is simply whether the "Second Amendment's plain text covers an individual's conduct."  There is no doubt that the Second Amendment phrase "to keep and bear arms" includes the right to purchase or sell arms. *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023); *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011). While the Second Amendment expressly protects the right to "keep and bear arms," the only way to exercise this right "is to get one, either through sale, rental, or gift," *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023), or to build one oneself. Therefore, because the text of the Second Amendment plainly covers Plaintiffs' conduct, it is Defendants' burden to justify its regulation by presenting evidence that the Final Rule aligns with the historical tradition of regulations in place at the time that the Second Amendment was ratified. The Final Rule itself offers no historical analogue that similarly regulated the private, non-commercial sale of firearms

---

[20] Joan Burbick, *Cultural Anatomy of a Gun Show*, 17 Stan. L. & Pol'y Rev. 657, 660 (2006).

between individuals.  That is because no historical analogue exists. For that reason, the Final Rule fails the *Bruen* test and is unconstitutional.

**C.      The Remining Factors Weigh in Plaintiffs' Favor**

**1.      The Final Rule irreparably harms Plaintiffs**

Without preliminary injunctive relief, Plaintiffs will suffer irreparable harm. As discussed above, the States are harmed though loss of tax revenue and administrative costs. None of those damages are recoverable from the United States; "a party suing the government suffers irreparable harm where monetary relief might not be available because of the government's sovereign immunity." *Kansas ex rel. Kansas Dep't for Child. & Fams. v. SourceAmerica*, 874 F.3d 1226, 1251 (10th Cir. 2017) (cleaned up). The Final Rule has already decreased attendees, vendors, and sales revenue at gun shows in Plaintiff States. Exs. 1 ¶¶ 13–17; 2 ¶¶ 9–11. Chisholm Trail will experience the same harm at its gun shows. As discussed above, the Final Rule will harm Individual Plaintiffs through their ability to sell firearms from their personal collection at gun shows. This harm began the moment the Final Rule took effect and is ongoing. This harm cannot be remedied after the fact. Preliminary relief is necessary.

**2.      The balance of the equities and public interest favor Plaintiffs**

There is no harm to Defendants in pausing their attempted usurpation of Congress's role by maintaining the *status quo* with standards that have been in place for decades. Defendants contend that they aren't—and don't have the power to—imposing universal background checks. 89 F.R. 28987. Firearms sold by those truly "engaged in the business" of firearms sales already require a background check. *Id.* And the Final Rule risks turning everyday citizens into criminals if they inadvertently sell guns according longstanding law but in violation of the Final Rule's changes. *Id.* at 28995. Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1279 (10th Cir. 2024). Maintaining the *status quo* while Plaintiffs challenge this rule is important and will ensure that otherwise law-abiding citizens aren't caught in the drag net of this overly broad and intrusive federal regulation.

**D.     A TRO and Injunction Should Apply Nationwide.**

Plaintiffs request a nationwide injunction pending a decision on the merits. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir.1989)); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 (2020). When agency actions are unlawful, nationwide preliminary relief is appropriate. *See e.g., D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 46–48 (D.D.C. 2020).  Indeed, the APA allows a reviewing court to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). "[T]ailoring an injunction to address the alleged harms to the remaining States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022).

A nationwide injunction is called for here. Because Plaintiffs include 20 States, an injunction limited to those States would create a patchwork of enforceable federal law while allowing the continued infringement of constitutional rights of citizens of States not party to this suit. Given the significant harms the Final Rule imposes, Plaintiffs ask that the Court issue a TRO and enjoin it pending a determination on the merits.

## CONCLUSION

For these reasons, Plaintiffs request the Court issue a TRO and a Preliminary Injunction.

KRIS W. KOBACH
Kansas Attorney General

*/s/Erin B. Gaide*
Abhishek S. Kambli, 29788
*Deputy Attorney General*
Erin B. Gaide, 29691
*Assistant Attorney General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131
abhishek.kambli@ag.ks.gov
erin.gaide@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

BRENNA BIRD
Iowa Attorney General

*/s/ Eric H. Wessan*
**Eric H. Wessan
*Solicitor General*
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric. Wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

AUSTIN KNUDSEN
 Montana Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN, 25622
 *Solicitor General*
**PETER M. TORSTENSEN, JR.
 *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for Plaintiff State of Montana*

STEVE MARSHALL
Alabama Attorney General

*/s/ Edmund G. LaCour, Jr.*
**Edmund G. LaCour, Jr.
*Solicitor General*
Office of the Alabama
Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, AL  36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Email: Edmund.LaCour@AlabamaAG.gov


*Counsel for Plaintiff State of Alabama*

TREG R. TAYLOR
Alaska Attorney General

*/s/ Aaron C. Peterson*
**Aaron C. Peterson
*Senior Assistant Attorney General*
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov


*Counsel for Plaintiff State of Alaska*

CHRISTOPHER CARR
Georgia Attorney General

*/s/ Stephen Petrany*
*Stephen Petrany
*Solicitor General*
Office of the Attorney General of Georgia
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov


*Counsel for Plaintiff State of Georgia*

RAÚL R. LABRADOR
Idaho Attorney General

*/s/ Joshua N. Turner*
**Joshua N. Turner
*Chief of Constitutional Litigation and Policy*
**Alan M. Hurst
Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Tel: (208) 334-2400
Josh.turner@ag.idaho.gov


*Counsel for Plaintiff State of Idaho*

TODD ROKITA
Indiana Attorney General

/s/ James A. Barta
*James A. Barta
*Solicitor General*
Office of the Attorney General of Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone:  (317) 232-0709
James.Barta@atg.in.gov

*Counsel for Plaintiff State of Indiana*

RUSSELL COLEMAN
Kentucky Attorney General

/s/ Victor B. Maddox
**Victor B. Maddox
**Aaron J. Silletto
**Zachary M. Zimmerer
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Aaron.Silletto@ky.gov
Zachary.Zimmerer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

ANDREW BAILEY
Missouri Attorney General

/s/ Bryce Beal
**Bryce Beal
*Assistant Attorney General*
Missouri Attorney General's Office
207 West High Street
Jefferson City, MO 65101
(573) 751-6633
Bryce.Beal@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

MICHAEL T. HILGERS
Nebraska Attorney General

/s/ Zachary A. Viglianco
*Zachary A. Viglianco
*Deputy Solicitor General*
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(531) 739-7645
zachary.viglianco@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

JOHN M. FORMELLA
New Hampshire Attorney General

/s/Brandon F. Chase
*Brandon F. Chase
*Assistant Attorney General*
New Hampshire Department of Justice
1 Granite Place – South
Concord, NH 03301
(603) 271-3650
brandon.f.chase@doj.nh.gov

*Counsel for Plaintiff New Hampshire*

DREW H. WRIGLEY
North Dakota Attorney General

/s/ Katie L. Carpenter
**Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney
General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov

*Counsel for Plaintiff State of North
Dakota*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ Garry M. Gaskins, II
**GARRY M. GASKINS, II
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:     (405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for Plaintiff State Oklahoma*

ALAN WILSON
South Carolina Attorney General

/s/ Joseph D. Spate
**Joseph D. Spate
*Assistant Deputy Solicitor General*
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Columbia, SC  29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Plaintiff State South Carolina*

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles D. McGuigan*
**Charles D. McGuigan
*Deputy Attorney General*
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us


*Counsel for Plaintiff State of South Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and Reporter

*/s/ Whitney D. Hermandorfer*
**WHITNEY D. HERMANDORFER
*Director of Strategic Litigation Unit*
**BRIAN DANIEL MOUNCE
*Counsel for Strategic Litigation &*
*Assistant Solicitor General*
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-1400
whitney.hermandorfer@ag.tn.gov
brian.mounce@ag.tn.gov


*Counsel for the State of Tennessee*

JASON S. MIYARES
Attorney General of Virginia

*/s/ Kevin M. Gallagher*
**Kevin M. Gallagher
*Principal Deputy Solicitor General*
**Brendan T. Chestnut
*Deputy Solicitor General*
**M. Jordan Minot
*Assistant Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
Email: bchestnut@oag.state.va.us
Email: mminot@oag.state.va.us


*Counsel for Plaintiff Commonwealth of Virginia*

PATRICK MORRISEY
West Virginia Attorney General

*/s/ Michael R. Williams*
**Michael R. Williams
*Principal Deputy Solicitor General*
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov


*Counsel for State of West Virginia*

BRIDGET HILL
Wyoming Attorney General


/s/ Ryan Schelhaas
**Ryan Schelhaas
 *Chief Deputy Attorney General*
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov


*Counsel for Plaintiff State Wyoming*

/s/ Michael D. McCoy
**Michael D. McCoy
**William E. Trachman
Mountain States
Legal Foundation
 2596 South Lewis Way
 Lakewood, Colorado 80227
 (303) 292-2021
Mmccoy@mslegal.org


*Counsel for Plaintiffs Allen Black, Donald Maxey,
and Chisholm Trail Antique Gun Association*

/s/ Anna St. John
**Anna St. John
Hamilton Lincoln Law Institute
1629 K St. NW Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

/s/ M. Frank Bednarz
**M. Frank Bednarz
Hamilton Lincoln Law Institute
1440 W. Taylor St. #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org


*Counsel for Plaintiff Phillip Journey*

*pro hac vice*
** *pro hac vice* forthcoming

## CERTIFICATE OF SERVICE

This is to certify that on this the 7th day of June, 2024, this motion was electronically filed with the Clerk of the Court by using the CM/ECF system with electronic delivery to all parties.

Respectfully submitted,

/s/ Erin B. Gaide
Erin B. Gaide