# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## WICHITA DIVISION

STATE OF KANSAS, ET AL.,

     *Plaintiffs*,

v.

MERRICK GARLAND IN HIS
OFFICIAL CAPACITY AS ATTORNEY
GENERAL OF THE UNITED STATES,
ET AL.,

     *Defendants*.

§
§
§
§
§
§
§
§
§
§
§

Civil Action No. 6:24-cv-01086-TC-TJJ

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

   I.   Statutory and Regulatory Background.........................................................................2

   II.   This Lawsuit .................................................................................................................3

LEGAL STANDARD .............................................................................................................4

ARGUMENT..........................................................................................................................5

   I.   The State Plaintiffs Fail to Plead a Plausible Basis for Standing ...............................6

       A.   The Alleged Incidental Effect of the Rule on State Revenues Does Not Constitute a Legally Cognizable Injury in Fact ...............................................6

       B.   The Rule's Alleged Effect on Tennessee's and New Hampshire's Background Check Procedures Is a Self-Inflicted Injury That Does Not Confer Standing..............................10

   II.   The Individual Plaintiffs Lack Standing to Bring a Pre-Enforcement Challenge.................11

   III.   Chisholm Trail Fails to Plausibly Allege a Basis for Standing ...................................13

   IV.   The Court Should Dismiss Any Plaintiffs That Lack Standing................................14

CONCLUSION.......................................................................................................................15

## TABLE OF AUTHORITIES

**Cases**

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) .................................................................................................7

*Baker v. USD 229 Blue Valley,*
979 F.3d 866 (10th Cir. 2020) ....................................................................................4, 9, 13

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ..........................................................................................................14

*Brady Campaign to Prevent Gun Violence v. Brownback,*
110 F. Supp. 3d 1086 (D. Kan. 2015) ...............................................................................5, 9

*Brady Campaign,*
110 F. Supp. .............................................................................................................................9

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .....................................................................................................5, 6, 13

*Collins v. Daniels,*
916 F.3d 1302 (10th Cir. 2019) .........................................................................................15

*Colo. Outfitters Ass'n v. Hickenlooper,*
823 F.3d 537 (10th Cir. 2016) ...............................................................................12, 13, 14

*Colorado v. EPA,*
989 F.3d 874 (10th Cir. 2021) .............................................................................................11

*Dias v. City & Cnty. of Denver,*
567 F.3d 1169 (10th Cir. 2009) ..........................................................................................12

*Fareed v. U.S. Dep't of Homeland Sec.,*
No. 23-cv-2006, 2023 WL 8599336 (D. Kan. Dec. 12, 2023) ...........................................9

*FDA v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) ....................................................................................................*passim*

*Florida v. Mellon,*
273 U.S. 12 (1927) .............................................................................................................6, 7

*Kansas v. Biden,*
No. 24-cv-1057, 2024 WL 2880404 (D. Kan. June 7, 2024),
*appeal filed,* No. 24-3093 (10th Cir. July 9, 2024) ...............................................6, 10, 11, 15

*Kansas v. Garland*,
    No. 2:24-cv-88, 2024 WL 2384611 (E.D. Ark. May 23, 2024) ................................... 3, 6, 15

*Kansas v. Garland*,
    No. 24-cv-1086, 2024 WL 3360533 (D. Kan. July 10, 2024) .................................... 4

*Laufer v. Looper*,
    22 F.4th 871 (10th Cir. 2022) ................................................................ 4, 5

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................ 1

*M.M.V. v. Garland*,
    1 F.4th 1100 (D.C. Cir. 2021) .............................................................. 15

*Mount Evans Co. v. Madigan*,
    14 F.3d 1444 (10th Cir. 1994) ............................................................. 15

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024) .................................................................... 5, 9

*Muscogee (Creek) Nation v. Okla. Tax Comm'n*,
    611 F.3d 1222 (10th Cir. 2010) ......................................................... 4, 5, 9

*Nova Health Sys. v. Gandy*,
    416 F.3d 1149 (10th Cir. 2005) ........................................................... 10

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ..................................................................... 11, 12

*S. Furniture Leasing, Inc. v. YRC, Inc.*,
    423 F. Supp. 3d 1163 (D. Kan. 2019) ....................................................... 4

*Shields Law Grp., LLC v. Stueve Siegal Hanson LLP*,
    95 F.4th 1251 (10th Cir. 2024) ............................................................. 4

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................................ 5

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ....................................................................... 14

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................. 5, 12, 13

*T.C. v. Aetna Life Ins. Co.*,
    No. 4:22-cv-42, 2023 WL 6377552 (D. Utah Sept. 29, 2023) ............................... 15

*Thiebaut v. Colo. Springs Utils.*,
    455 F. App'x 795 (10th Cir. 2011) ...............................................................................15

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...............................................................................15

*United States v. Texas*,
    599 U.S. 670 (2023) ........................................................................ 1, 5, 7

*Wyoming v. U.S. Dep't of Interior*,
    674 F.3d 1220 (10th Cir. 2012) ...............................................................5, 7, 10, 14

**Statutes**

18 U.S.C. § 921 ...............................................................................2

18 U.S.C. § 921(a)(21)(C) ...............................................................................2

18 U.S.C. § 922(a)(1)(A) ...............................................................................2

18 U.S.C. § 922(t) ...............................................................................10

Pub. L. No. 99-308, 100 Stat. 499 (1986) ...............................................................................2

Pub. L. No. 117-159, 136 Stat. 1325 (2022) ...............................................................................2

**Rules**

Federal Rule of Civil Procedure 5(b)(2) ...............................................................................17

Federal Rule of Civil Procedure 12(b)(1) ........................................................................ 4, 5, 6

**Regulations**

27 C.F.R. § 478.13(a) ........................................................................ 3, 12

27 C.F.R. § 478.121 ...............................................................................2

28 C.F.R. § 25.2 ...............................................................................10

*Definition of "Engaged in the Business" as a Dealer in Firearms*,
    89 Fed. Reg. 28,968 (Apr. 19, 2024) ...............................................................................1

## INTRODUCTION

Under the Gun Control Act, those "engaged in the business" of dealing in firearms must obtain a federal license and comply with certain verification, background check, and recordkeeping obligations when transferring firearms. In 2022, Congress expanded the definition of being "engaged in the business" via the Bipartisan Safer Communities Act, and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) promulgated a Final Rule implementing that statutory change and further clarifying what it means to be "engaged in the business" of dealing in firearms.[1] Plaintiffs challenge that Rule under the Administrative Procedure Act (APA) and on several constitutional grounds, and they ask this Court to declare the Rule unlawful and to either vacate it or enjoin its enforcement. Plaintiffs' claims are meritless, and Defendants intend to continue to vigorously defend the Rule's lawfulness should this case progress to resolution of the merits. But this lawsuit need go no further because Plaintiffs fail to establish Article III standing to challenge the Rule.

The economic harms related to state tax revenues and background checks that the State plaintiffs allege are neither legally cognizable injuries, nor concrete and imminent enough to confer standing. The individual plaintiffs lack standing to bring a pre-enforcement challenge against the Rule because the firearms-related conduct they allege does not constitute being "engaged in the business" of dealing in firearms and is therefore not encompassed by the Rule, and they additionally fail to allege a credible threat of the Rule being applied against them specifically. And the organizational plaintiff lacks standing to sue either on its own behalf or on behalf of its alleged members.

Standing is not "merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to be adjudicated." *United States v. Texas*, 599 U.S. 670, 675 (2023) (citation omitted). It is "an indispensable part" of Plaintiffs' case. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs have failed to allege a plausible basis for standing here. The Court should accordingly dismiss their Complaint for lack of subject-matter jurisdiction.

---

[1] *See* Final Rule, *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024) (Rule).

## BACKGROUND

**I.      Statutory and Regulatory Background**

Under the Gun Control Act (GCA) of 1968, 18 U.S.C. § 921 *et seq.*, anyone "engage[d] in the business of . . . dealing in firearms" must obtain a federal license.  18 U.S.C. § 922(a)(1)(A).  Federal law imposes various obligations on federal firearms licensees (FFLs).  When transferring firearms, for instance, an FFL generally must meet the transferee in person, verify his or her identity, and submit the transferee's information to the FBI's National Instant Criminal Background Check System (NICS), which will deny the transaction if the background check reveals that the transferee is prohibited by law from possessing or receiving the firearm.  *Id.* §§ 922(b)(5), (c), (t)(1).  FFLs are also required, among other things, to maintain records of firearm acquisitions and dispositions, which enable the tracing of firearms found at crime scenes back to their first retail purchaser.  *Id.* §§ 922(b)(5), 923(g)(1)(A); 27 C.F.R. §§ 478.121-478.134.

Congress first defined "engaged in the business" of dealing in firearms in 1986.  *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986).  And in the Bipartisan Safer Communities Act (BSCA) of 2022, Congress expanded that definition to eliminate the requirement that a person have "the principal objective of livelihood and profit," replacing it with a required intent "to predominantly earn a profit."  Pub. L. No. 117-159, 136 Stat. at 1324-25, § 12002.  Following that statutory change, federal law now provides that

> The term "engaged in the business" means—. . . as applied to a dealer in firearms, . . . a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C).  The BSCA also defined "to predominantly earn a profit" to mean in relevant part "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection."  *Id.* § 921(a)(22).

ATF promulgated the Rule to implement the BSCA and to clarify the circumstances under which a person is "engaged in the business" of dealing in firearms. The Rule's definition of "engaged in the business" and "to predominantly earn a profit" are substantively identical to the statutory definitions. *See* 27 C.F.R. § 478.13(a), (d). The Rule also defines certain terms in the GCA, *see, e.g.*, *id.* § 478.11 (defining "personal collection"); provides that determining whether someone is "engaged in the business" is a "fact-specific inquiry," *id.* § 478.13(b); and sets forth circumstances that give rise to rebuttable presumptions, applicable only in civil and administrative proceedings, that a person is engaged in the business or has the predominant intent to earn a profit, *id.* §§ 478.13(c), (d)(2). The Rule was promulgated on April 19, 2024, and took effect on May 20.

## II.   This Lawsuit

On May 1, 2024, twenty-one states, three individuals, and an organization brought suit in the Eastern District of Arkansas, challenging the Rule under the APA and on multiple constitutional grounds. *See* Compl. ¶¶ 1-6, 119-213. Plaintiffs ask the Court to declare the Rule unlawful and to vacate it or enjoin its enforcement. *Id.*, Prayer for Relief. The Complaint further alleges how the Rule separately harms the State plaintiffs, the individual plaintiffs, and the organizational plaintiff, Chisholm Trail Antiques Gun Association (Chisholm Trail). *Id.* ¶¶ 60-118.

Plaintiffs moved for a preliminary injunction on May 6, 2024, which Defendants opposed. *See* ECF Nos. 4, 5, 40. Following a hearing, the Eastern District of Arkansas court issued an Order dismissing Arkansas as a plaintiff for lack of standing. *See Kansas v. Garland*, No. 2:24-cv-88, 2024 WL 2384611, at *1 (E.D. Ark. May 23, 2024). The court found that Arkansas's alleged revenue-related injuries were too "vague and speculative" to establish standing. *Id.* at *2. And because Arkansas's dismissal meant that "no Plaintiff with standing reside[d] in th[e] district," the court transferred the case to the District of Kansas for lack of venue. *Id.* at *1.

Following that transfer, Plaintiffs renewed their motion for a preliminary injunction on June 7, 2024, which Defendants again opposed. *See* ECF Nos. 103, 104, 135. This Court held a hearing on July 1, 2024. And on July 10, the Court entered a Memorandum and Order (Order) denying

Plaintiffs' motion for preliminary relief.  ECF No. 164.[2]  The Court first concluded that Plaintiffs failed to demonstrate standing "to the degree necessary for injunctive relief."  Order at 7.  According to the Court, the three individual plaintiffs and Chisholm Trail all "appear[ed] to allege speculative injuries."  *Id.* at 8; *see id.* (noting that Chisholm Trail's "theory of injury depends on a layered prediction").  And it explained that the State plaintiffs "ha[d] not established with any degree of certainty that they have standing."  *Id.* at 9; *see id.* at 8 ("The state plaintiffs' standing hurdle is even more difficult.").  The Court also concluded that Plaintiffs "fail[ed] to meet the heightened standard of demonstrating that they [were] 'substantially likely' to succeed on the merits" and further noted that "[s]everal unique procedural considerations . . . bolster[ed]" its conclusion that preliminary relief was unwarranted.  *Id.* at 10, 12.  Plaintiffs have appealed the Court's Order.  *See* No. 24-3101 (10th Cir. filed July 19, 2024).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move to dismiss a complaint for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Because a challenge to a plaintiff's standing implicates a federal court's power to hear a case, *see Shields Law Grp., LLC v. Stueve Siegal Hanson LLP*, 95 F.4th 1251, 1279 (10th Cir. 2024), a motion to dismiss for lack of standing is thus "construed pursuant to Rule 12(b)(1)," *S. Furniture Leasing, Inc. v. YRC, Inc.*, 423 F. Supp. 3d 1163, 1169 n.2 (D. Kan. 2019).  A Rule 12(b)(1) motion to dismiss generally "takes one of two forms: a facial attack or a factual attack."  *Id.* at 1168; *see Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020).  Defendants' motion here is a facial attack, which "looks only to the factual allegations of the complaint."  *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010); *see Laufer v. Looper*, 22 F.4th 871, 875 (10th Cir. 2022) ("Because [Defendants] have not adduced any evidence outside the pleadings to contest jurisdiction, we address this issue as a facial challenge . . . .").  And if those allegations, even if assumed true, "fail to establish jurisdiction," the complaint must be dismissed.  *Laufer*, 22 F.4th at 874-75 (citation omitted).

---

[2] *Kansas v. Garland*, No. 24-cv-1086, 2024 WL 3360533 (D. Kan. July 10, 2024).

## ARGUMENT

Plaintiffs' Complaint should be dismissed because Plaintiffs fail to plausibly allege that they have standing to challenge the Rule, and therefore fail to establish subject-matter jurisdiction.  "Article III of the Constitution permits federal courts to decide only 'Cases' or 'Controversies,'" and "[t]o establish a case or controversy, a plaintiff must possess standing to sue."  *Laufer*, 22 F.4th at 876 (citations omitted).  To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  An injury confers standing only if it is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("Allegations of *possible* future injury are not sufficient." (cleaned up)).  An alleged injury must also be "legally and judicially cognizable," meaning that the "dispute" in question must be one "traditionally thought to be capable of resolution through the judicial process."  *Texas*, 599 U.S. at 676 (citation omitted).  Plaintiffs always "bear[] the burden of establishing standing as of the time" they "brought th[e] lawsuit."  *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (citations omitted).  At the pleading stage, the plaintiff "must clearly allege facts demonstrating each element" of standing.  *Spokeo*, 578 U.S. at 338 (cleaned up).  And while a court must accept a plaintiff's "well-pleaded factual allegations as true," *Muscogee (Creek) Nation*, 611 F.3d at 1227, it is "not bound by conclusory allegations, unwarranted inferences, or legal conclusions," *Brady Campaign to Prevent Gun Violence v. Brownback*, 110 F. Supp. 3d 1086, 1092 (D. Kan. 2015).

"[L]ook[ing] only to the factual allegations" in Plaintiffs' Complaint, *Muscogee (Creek) Nation*, 611 F.3d at 1227 n.1, none of the Plaintiffs here—the State plaintiffs, the three individual plaintiffs, or Chisholm Trail—plead a plausible basis for standing.  And even if the Court were to consider the extra-pleading declarations Plaintiffs filed at the preliminary injunction stage, the "conclusory statements" and wholly "speculative" assertions in those materials fall short of meeting Plaintiffs' standing burden.  *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1236 (10th Cir. 2012).  Plaintiffs' Complaint should accordingly be dismissed.  *See* Fed. R. Civ. P. 12(b)(1).

I.      **The State Plaintiffs Fail to Plead a Plausible Basis for Standing**

Twenty states, led by Kansas, base their standing to challenge the Rule on two alleged injuries in fact.  First, most of the State plaintiffs allege that they stand to lose an uncertain amount of sales tax revenue derived from firearms sales and gun shows "if the Final Rule goes into effect."  Compl. ¶ 65; *see id.* ¶¶ 60-92.  Second, Tennessee and New Hampshire separately allege that the Rule "will result in an increase in administrative costs" related to each state's voluntary decision to conduct federally mandated background checks for firearms sales on its own.  *Id.* ¶¶ 108, 114.[3]  Yet neither of these alleged economic harms amounts to a legally cognizable injury, nor are they concrete, actual, and imminent.

A.      **The Alleged Incidental Effect of the Rule on State Revenues Does Not Constitute a Legally Cognizable Injury in Fact**

The State plaintiffs' first alleged injury "relies on a highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410.  Specifically, that injury hinges on there being (1) a decrease in "the number of individuals who sell firearms, period," because of the Rule; (2) an attendant decrease in "the number of vendors at gun shows"; (3) a corresponding decrease in table rentals, attendance, and firearms sales at such shows; and (4) ultimately, some unknown reduction in sales tax revenues derived from gun shows.  Compl. ¶¶ 61-65.  Plaintiffs also allege a similar expected decrease in revenues from online firearms sales.  *Id.* ¶¶ 66-68.  But such incidental downstream effects of a federal policy on state tax revenues do not qualify as judicially cognizable injuries for purposes of standing.  And in any event, the State plaintiffs' "sales-tax theory" of injury, as this Court has already recognized, is simply too "speculative" to constitute an injury in fact.  Order at 8.

The Supreme Court long ago explained that a state may sue the federal government only if it has suffered a "*direct* injury" as a result of a federal action or policy.  *Florida v. Mellon*, 273 U.S. 12, 18

---

[3] As the Court has already acknowledged, West Virginia and Montana "d[o] not plead any facts" whatsoever "to demonstrate how they have been harmed" by the Rule.  Order at 8.  Both states should thus be dismissed as plaintiffs.  *See Kansas*, 2024 WL 2384611, at *1 (dismissing Arkansas from this case for "fail[ing] to demonstrate standing"); *see also Kansas v. Biden*, No. 24-cv-1057, 2024 WL 2880404, at *2 (D. Kan. June 7, 2024), *appeal filed* No. 24-3093 (10th Cir. July 9, 2024) (dismissing pursuant to Rule 12(b)(1) eight state plaintiffs that failed to establish standing).

(1927).  In *Florida v. Mellon*, Florida challenged the constitutionality of a federal inheritance tax and argued that the tax would cause it financial harm by "inducing potential taxpayers to withdraw property," thus diminishing the state's tax base.  *Id.* at 17-18.  But the Court rejected that theory of standing, explaining that Florida needed to show a "direct injury," and that any harm caused by the federal tax was "purely speculative, and at most, only remote and indirect."  *Id.* at 18.  The Court reiterated this same principle just over a year ago when it observed that because "federal policies frequently generate indirect effects on state revenues or state spending," when a state "asserts . . . that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated."  *Texas*, 599 U.S. at 680 n.3 (2023).  And the Tenth Circuit, too, has adopted this bedrock principle, explaining that "the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest . . . that impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact to support state standing."  *Wyoming*, 674 F.3d at 1234 (citation omitted).

This principle makes sense in light of the practical features of federal-state relations.  Because virtually any federal action (or inaction) could conceivably have some incidental effect on state finances, the State plaintiffs' sales-tax theory of standing here would allow them to challenge nearly every federal policy to which their elected leaders object.  Article III's standing requirements are not so boundless.  *See Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, J.) ("Are we really going to say that any federal regulation of individuals . . . that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court? If so, what limits on state standing remain?").  Indeed, the Supreme Court this Term deemed a similarly "limitless approach" to standing as "flatly inconsistent with Article III."  *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 391-92 (2024).  In *Alliance for Hippocratic Medicine*, a group of pro-life doctors challenged FDA regulations making it easier for patients to obtain mifepristone, a drug that can be used to terminate pregnancies.  *Id.* at 372-73.  The doctors based their standing to bring such a challenge in part on the "various monetary and related injuries" they allegedly would have "suffer[ed] as a result of FDA's actions," including having to "divert[] resources and time from other patients to treat patients with

7

mifepristone complications." *Id.* at 390.  The Court rejected "such a novel standing doctrine," however, explaining that "the law has never permitted doctors to challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries." *Id.* at 391.  And the Court further observed that such a "limitless approach" to standing, if taken to its logical end, "would seemingly" allow "virtually every citizen" to have standing "to challenge virtually every government action that they do not like." *Id.* at 392.  Replace "citizen" with "State," and the Court's reasoning equally describes the State plaintiffs' sales-tax theory of injury in this case.

That theory, in any event, fails on its own terms.  The State plaintiffs attempt to tie their alleged revenue injury in part to an expected, but uncertain, decrease in the number of individuals dealing firearms, *see* Compl. ¶ 61, and, by extension, a decrease in firearms sales (and sales taxes assessed) at gun shows and online, *see id.* ¶¶ 62, 65-68; *see also, e.g., id.* ¶ 75 (alleging that Kansas collects sales tax on "sale[s] of firearms during gun shows").[4]  But this alleged causal chain rests on a flawed premise:  Even if the Rule marginally reduces the number of *individuals* who sell firearms, that by no means compels the conclusion that the aggregate number of *firearms* sold in each state will decrease in equal measure, or even at all.  To the contrary, it is entirely possible, if not expected, that those wanting to purchase firearms will just go elsewhere, including to FFLs, to do so.  And that would mean that roughly the same number of firearms will be sold in the plaintiff States under the Rule, just from a slightly smaller pool of sellers, such that no decrease in sales tax revenues ever materializes.

The alleged decrease in taxes assessed on tables and admissions at gun shows, *id.* ¶¶ 64-65; *see, e.g., id.* ¶¶ 75, 84, similarly "require[s] guesswork as to how independent decisionmakers will exercise

---

[4] It should be noted that the State plaintiffs allege different tax structures, meaning that, even taking their sales-tax theory at face value, they will not be equally affected by any impact the Rule might have on gun shows and firearms sales.  Only a handful of states, for instance, allege that they tax online firearms sales.  Compl. ¶¶ 74, 79, 82, 90-91.  Other states allege only that they tax firearms sales at gun shows.  *Id.* ¶¶ 69, 71, 73, 75, 77-78, 80, 83.  Some states admit that they do not tax certain firearms sales at gun shows at all.  *Id.* ¶¶ 76, 86; *see id.* ¶ 92 (admitting that Alaska "does not levy any tax related to gun shows").  And Tennessee and New Hampshire do not clearly allege whether they even tax firearms sales, whether made at gun shows or online.  This variation only underscores the speculation involved in ascertaining the Rule's potential effect on any state's revenue.

their judgment" in response to the Rule.  *Murthy*, 144 S. Ct. at 1986 (citation omitted).  For instance, even if some currently unlicensed firearms vendors choose not to participate in future gun shows because of the Rule, Plaintiffs' conclusory allegations provide no basis for inferring that show organizers will elect not to replace those vendors with others unaffected by the Rule (including FFLs), or that gun show admissions would necessarily decline because a handful of unlicensed vendors exit the market.  *See Brady Campaign*, 110 F. Supp. at 1092 (noting that courts are "not bound by . . . unwarranted inferences").  And even assuming that gun show admissions might decline slightly, there is every reason to think that those who decide not to attend a particular gun show will otherwise spend their discretionary income on other taxable goods and services.  In short, the State plaintiffs' sales-tax theory, as this Court has already noted, "depend[s]" too heavily "on a speculative chain with many uncertain links."  Order at 9; *see Alliance*, 602 U.S. at 383 (explaining that standing doctrine "precludes speculative links—that is, where it is not sufficiently predictable how third parties w[ill] react to government action or cause downstream injury to plaintiffs."); *Baker*, 979 F.3d at 874 (rejecting a theory of injury that "pile[d] conjecture upon contingency").

The extra-pleading declarations that Plaintiffs filed at the preliminary injunction stage do not make their alleged sales-tax injury any less speculative.[5]  The declarations from state tax officials, *see* ECF Nos. 104-9, 104-10, 104-11, merely parrot "the same speculative chain" of contingencies alleged in Plaintiffs' Complaint.  Order at 9.  And the two declarations from gun show organizers, *see* ECF Nos. 104-1, 104-2, indicate, at most, that a state may lose some sales tax revenue if an organizer decides to cancel a show entirely.  But as the Court observed, such cancellations "alone do[] not substantiate" Plaintiffs' "tax-based theory of injury-in-fact."  Order at 9.  To the contrary, those cancellations simply confirm that any such revenue loss is fairly traceable not to the Rule, but rather to "independent"

---

[5] Because Defendants facially attack Plaintiffs' standing here, these extra-pleading materials are not properly before the Court.  *See Muscogee (Creek) Nation*, 611 F.3d at 1227 n.1 ("A facial attack looks only to the factual allegations of the complaint in challenging the court's jurisdiction."); *Fareed v. U.S. Dep't of Homeland Sec.*, No. 23-cv-2006, 2023 WL 8599336, at *4 (D. Kan. Dec. 12, 2023) (resolving Rule 12(b)(1) motions "by referring to the pleadings alone").  Defendants nonetheless address them to underscore that amending Plaintiffs' Complaint to incorporate these materials would be futile.

business decisions made by "some third party not before the court." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005) (citation omitted).

At bottom, the State plaintiffs' sales-tax theory of injury is "simply too speculative" and "too attenuated to support Article III standing." *Alliance*, 602 U.S. at 393; *see id.* at 383 (explaining that plaintiffs cannot establish standing "where the government action is so far removed from its distant (even if predictable) ripple effects"). The Court should thus reject Plaintiffs' invitation "to deviate from . . . [the] general rule that reduced state tax revenue doesn't qualify as an injury in fact." *Kansas*, 2024 WL 2880404, at *17; *see Wyoming*, 674 F.3d at 1234.

### B.    The Rule's Alleged Effect on Tennessee's and New Hampshire's Background Check Procedures Is a Self-Inflicted Injury That Does Not Confer Standing

Tennessee and New Hampshire separately allege that the Rule will impose "additional administrative costs" related to federally mandated background checks that both States have elected to conduct themselves. Compl. ¶¶ 108, 114. Federal law requires FFLs to run a background check through the NICS before transferring a firearm to a prospective purchaser, the purpose of which is to ensure that the purchaser is not prohibited by law from receiving or possessing the firearm. *See* 18 U.S.C. § 922(t). In most states, FFLs contact the NICS directly, and the FBI conducts the requisite background checks for no fee and at no cost to state governments. Federal regulations also permit states to voluntarily serve as the point of contact for such checks; in these "Point-of-Contact" states, FFLs instead contact a state agency regarding background checks, and that agency conducts the checks by querying law enforcement databases, including federal databases maintained by the FBI. *See* 28 C.F.R. §§ 25.2, 25.6. Tennessee and New Hampshire are both "Point-of-Contact" states and accordingly require FFLs to run background checks through state agencies. *See* Compl. ¶¶ 95, 111. And both states allege that the Rule will cause "a significant increase in the number of individuals becoming [FFLs]," which will lead to an "increase in background checks," which will in turn "result in an increase in administrative costs" incurred by those state agencies. *Id.* ¶¶ 93, 107-08, 114.

Yet this background check theory of injury also fails to confer standing. As an initial matter, the expected increase in the number of private firearms sellers obtaining licenses is caused by the

*statutory* broadening of the definition of being "engaged in the business," meaning that any corresponding increase in background checks is traceable to the BSCA—which Plaintiffs do not challenge—rather than the Rule.  More fundamentally, however—and as the Court has already recognized—any increase in administrative "burdens" borne by Tennessee and New Hampshire would be the product of their "voluntary" decision to take responsibility for conducting background checks themselves.  Order at 9 n.3; *see id.* (noting that such "voluntary" burdens are "unlikely to suffice as injuries-in-fact").  Neither state is required to do so.  Accordingly, if changes to federal firearms laws naturally require a greater number of background checks, and if a state elects to conduct those checks itself (rather than having FFLs contact the NICS directly at no cost to the state), any costs incurred by the state as a result of that voluntary "legislative decision" is the very sort of "self-inflicted" injury that is "not legally cognizable" for purposes of standing.  *Colorado v. EPA*, 989 F.3d 874, 888 (10th Cir. 2021).  Indeed, the Supreme Court has similarly held that injuries to a State's "fisc[]" are "self-inflicted," and thus fail to confer standing, if they "result[] from decisions" made by that State's legislature.  *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).

Tennessee and New Hampshire "have made their choice" to take on the burden of conducting federally mandated background checks themselves, and "if they don't like" the consequences of that choice, "they're fully free to change" course.  *Kansas*, 2024 WL 2880404, at *18.  But what they cannot do is "complain about"—and assert standing based on—an alleged fiscal injury that is entirely "inflicted by [their] own hand."  *Pennsylvania*, 426 U.S. at 664.

## II.    The Individual Plaintiffs Lack Standing to Bring a Pre-Enforcement Challenge

The three individual plaintiffs in this case—Plaintiffs Journey, Black, and Maxey, *see* Compl. ¶¶ 3-5—also fail to plausibly allege that they have standing to challenge the Rule.  All three plaintiffs allege a vague economic injury flowing from the Rule—specifically, that it will "reduce trade among [firearms] collectors such that prices" for firearms "will increase while purchasing options [will] decrease."  Compl. ¶¶ 115-17.  But this alleged harm depends not only on (1) unlicensed vendors electing to leave the firearms market altogether and (2) an attendant decrease in firearms sales, but also (3) a decrease in such sales that is so substantial as to affect prices in the broader firearms market,

(4) including the prices of the particular firearms that the individual plaintiffs may wish to purchase at some point in the future. Such a theory of injury is even more speculative and attenuated than the State plaintiffs' sales-tax theory, and it likewise fails to confer standing as a result.

Journey and Black separately seek prospective relief from the Rule potentially being applied to their firearms-related conduct. They allege that they periodically attend gun shows and "buy and sell firearms for and from" their respective "personal collection[s]." Compl. ¶¶ 3-4; *see id.* (alleging that Journey and Black are both "firearms collector[s] and hobbyist[s]" who are "not engaged in the firearms business"). To have standing to bring a pre-enforcement challenge, however, Journey and Black must (1) "intend[] to engage in conduct that violate[s]" the Rule and (2) "face[] a credible threat of" enforcement "as a result." *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 546 (10th Cir. 2016); *see Susan B. Anthony List*, 573 U.S. at 158-59. Their allegations fail to satisfy this standard.[6]

Most notably, Journey and Black have not alleged conduct that amounts to being "engaged in the business" of dealing in firearms. Their occasional sales at gun shows of firearms from their personal collections do not so qualify, principally because neither plaintiff alleges that he makes such sales "to predominantly earn a profit"—a requirement of being "engaged in the business." 27 C.F.R. § 478.13(a). Nor do Journey and Black allege that, outside of these occasional sales, they otherwise "devote time, attention, and labor to dealing in firearms as a regular course of trade or business." *Id.* They accordingly lack standing to seek prospective relief from a Rule that, per their own allegations, does not affect them. *See Colo. Outfitters*, 823 F.3d at 548 (finding no standing where the plaintiffs failed to "indicat[e] they had even a general intent to engage in conduct that might violate" the state law they were challenging, "let alone any specific plans to do so"); *see also Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1176-77 (10th Cir. 2009) (finding no "credible threat of future enforcement" because the plaintiffs failed to allege an intent to engage in any conduct that would have been subject to the local ordinance they were challenging).

---

[6] Maxey does not allege that he sells firearms in any capacity. *See* Compl. ¶ 5 ("[H]e *purchases* firearms for his personal collection at gun shows." (emphasis added)); *id.* ¶ 117 (failing to allege that the Rule will arguably require Maxey to obtain a federal firearms license). Any risk of future enforcement against him of a Rule that defines "engag[ing] in the business" of firearms *dealing* is thus nonexistent.

This conclusion holds even if the Court were to consider Plaintiffs' extra-pleading declarations, or if Plaintiffs were to amend their Complaint to incorporate them. *See* ECF Nos. 104-4, 104-5. The additional details in those declarations, even if accepted as true, still do not describe any intent to engage in conduct that would require a federal firearms license, thus rendering any "fear of future enforcement . . . wholly speculative." ECF No. 135 (quoting *Susan B. Anthony List*, 573 U.S. at 160, 163); *see Colo. Outfitters*, 823 F.3d at 548. And, of course, Journey and Black—who brought suit before the Rule even went into effect—do not and could not allege any history of the Rule being applied to gunowners who, like them, only occasionally sell firearms at gun shows to enhance their personal collections. *Cf. Susan B. Anthony List*, 573 U.S. at 164 (finding a credible threat of enforcement where there was "a history of past enforcement," including against the plaintiff, and that such enforcement was "not a rare occurrence").

Journey and Black appear to allege that they may nevertheless obtain a federal firearms license because they believe the Rule will require them to do so. *See* Compl. ¶¶ 115-16. Such an assertion is a legal conclusion that the Court need not credit, however. Nor can the individual plaintiffs "manufacture standing merely by inflicting harm on themselves" based solely on their "subjective fear" of the Rule. *Clapper*, 568 U.S. at 416, 418. The Court, moreover, has already taken note of the individual plaintiffs' "uncertain[ty]" as to "whether they will become licensed," Order at 8, and such "some day intentions" fail to establish "actual or imminent injury" for standing purposes. *Baker*, 979 F.3d at 875 (citation omitted). And the Tenth Circuit has also made clear that "compliance with the challenged [Rule]"—which here would entail obtaining a federal firearms license—cannot "satisfy the credible-threat-of-[enforcement] test" for standing. *Colo. Outfitters*, 823 F.3d at 548. Journey and Black accordingly lack standing to bring a pre-enforcement challenge against the Rule.

## III.    Chisholm Trail Fails to Plausibly Allege a Basis for Standing

Plaintiffs' Complaint cannot be saved by Chisholm Trail because it too lacks standing. Plaintiffs first suggest that Chisholm Trail has associational standing to bring suit on behalf of its members—including Plaintiffs Black and Maxey—who are allegedly affected by the Rule. *See* Compl. ¶ 118. But Chisholm Trail cannot base its standing on Black and Maxey because they both fail to

adequately allege "standing to sue in their own right." *Colo. Outfitters*, 823 F.3d at 550 (citation omitted). Nor does Chisholm Trail's vague "self-description" of its other unnamed members' firearms-related "activities" suffice to establish associational standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009); *see id.* at 498 (requiring that an organizational plaintiff "make specific allegations establishing that at least one identified member had suffered or would suffer harm").

Chisholm Trail also alleges that the Rule will cause financial harm to the organization, specifically by "reduc[ing]" the revenues Chisholm Trail earns "from the gun shows that it sponsors and manages because [the Rule] would result in fewer vendors and attendees." Compl. ¶ 118. Yet Plaintiffs' Complaint leaves it at that, and does not further allege (1) how many vendors at Chisholm Trail's shows are usually unlicensed, (2) what proportion of a show's revenue those vendors typically generate, (3) whether any vendors have said they will not participate in future shows because of the Rule, and (4) whether any vendors who elect not to participate could be replaced (e.g., by FFLs), such that there is no decrease in the number of firearms on offer to show attendees. Plaintiffs thus provide no basis for plausibly inferring that, at the end of this chain of contingencies, Chisholm Trail actually stands to lose gun-show-related revenues because of the Rule. *See Wyoming*, 674 F.3d at 1233-34 (noting that "conclusory statements" fail to establish standing). And Chisholm Trail's extra-pleading declaration merely repeats the Complaint's conclusory allegations of harm. *See* ECF No. 104-7 ¶ 8.

Accordingly, as at the preliminary injunction stage, Chisholm Trail's "theory of injury"—which relies on a "layered prediction" as to how various independent actors will respond to the Rule—is "insufficient" to establish standing. Order at 8; *see Alliance*, 602 U.S. at 393 ("The asserted causal link is simply too speculative or too attenuated to support Article III standing.").

## IV.    The Court Should Dismiss Any Plaintiffs That Lack Standing

Because no Plaintiff here adequately alleges standing to challenge the Rule, the Court should dismiss Plaintiffs' Complaint in its entirety. But even if the Court were to find that some Plaintiffs have carried their standing burden at this stage, it should still dismiss those Plaintiffs that have not done so. While it is true that a "suit may proceed" if "at least one plaintiff has standing," *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023), that does not mean that "a court *must* permit a plaintiff that

*lacks* standing to remain" in that suit simply because another "co-plaintiff has standing." *Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 802 (10th Cir. 2011) (unpublished).  Indeed, the Tenth Circuit has made clear that "[e]ach plaintiff must have standing to seek each form of relief in each claim." *Collins v. Daniels*, 916 F.3d 1302, 1312 (10th Cir. 2019) (citation omitted).  And the Supreme Court recently underscored that "Article III does not give federal courts the power to order relief to any uninjured plaintiff," and that "[p]laintiffs must maintain their *personal interest*" in a case "at all stages of litigation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citations omitted) (emphasis added). Consistent with these principles, district courts thus "retain discretion to analyze the standing of all plaintiffs in a case and to dismiss those plaintiffs that lack standing." *Thiebaut*, 455 F. App'x at 802; *see Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451-53 (10th Cir. 1994) (dismissing some plaintiffs for lack of standing despite concluding that another plaintiff had standing); *see also M.M.V. v. Garland*, 1 F.4th 1100, 1110 (D.C. Cir. 2021) (agreeing that courts are not "*prohibit[ed]* . . . from paring down a case by eliminating plaintiffs who lack standing").

The Court should exercise such discretion here and dismiss any Plaintiffs it finds lack standing. *See, e.g.*, Order at 8 ("The state plaintiffs' standing hurdle is even more difficult.").  "Narrowing th[is] case to its . . . viable parties" would not only "narrow[] the burden of adjudicating the relevant issues," but also align with the principle that unharmed plaintiffs "shouldn't piggyback on," and potentially benefit from, "injured plaintiffs' standing." *Kansas*, 2024 WL 2880404, at *15.  Other district courts have recently taken this party-specific approach to standing, *see id.* at *2, *14-*15; *T.C. v. Aetna Life Ins. Co.*, No. 4:22-cv-42, 2023 WL 6377552, at *1 (D. Utah Sept. 29, 2023), including in this very case, *see Kansas*, 2024 WL 2384611, at *1 (dismissing Arkansas for lack of standing).  To ensure that the various Plaintiffs here are not "mere bystander[s], but instead . . . have a 'personal stake'" in this dispute, *Alliance*, 602 U.S. at 379 (citation omitted), this Court should follow suit and dismiss those that have failed to plausibly allege a basis for standing.

## CONCLUSION

The Court should grant Defendants' motion to dismiss for lack of subject-matter jurisdiction.

Dated: July 29, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Zachary W. Sherwood*
ZACHARY W. SHERWOOD
(IN Bar No. 37147-49)
JEREMY S.B. NEWMAN
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 616-8467
Fax: (202) 616-8470
Email: zachary.w.sherwood@usdoj.gov

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

On July 29, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, District of Kansas, using the electronic case filing system of the Court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Zachary W. Sherwood*
Zachary W. Sherwood