# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, *et al.*,

               Plaintiffs,

      v.

MERRICK GARLAND, ET AL.,

               Defendants.

Civil Action No. 6:24-cv-01086-TC-TJJ
Judge Toby Crouse

---

# MOVANT STATES' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO INTERVENE AS DEFENDANTS

## <u>TABLE OF CONTENTS</u>

**Page(s)**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

ARGUMENT

    I.    MOVANT STATES ARE ENTITLED TO INTERVENE AS OF RIGHT .................................................................................................................4

        A.    Movant States Have Substantial Interests In Upholding The Final Rule ...............................................................................................5

        B.    Existing Parties Will No Longer Adequately Represent Movant States' Interests, And Movant States Timely Intervened In Light Of That Change ...............................................12

CONCLUSION.....................................................................................................................15

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Abramski v. United States,*
573 U.S. 169 (2014)..................................................................................................3, 6

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982)..................................................................................................8, 9

*Berger v. N.C. State Conf. of the NAACP,*
597 U.S. 179 (2022)......................................................................................................5

*Biden v. Nebraska,*
600 U.S. 477 (2023)......................................................................................................8

*Brumfield v. Dodd,*
749 F.3d 339 (5th Cir. 2014) ......................................................................................12

*California v. Texas,*
593 U.S. 659 (2021)....................................................................................................14

*Cameron v. EMW Women's Surgical Ctr., P.S.C.,*
595 U.S. 267 (2022)....................................................................................................14

*Coal. of Ariz./N.M. Cntys. of Stable Econ. Growth v. Dep't of the Interior,*
100 F.3d 837 (10th Cir. 1996) ......................................................................................5

*Cook Cnty. v. Texas,*
37 F.4th 1335 (7th Cir. 2022) ....................................................................................14

*Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.,*
619 F.3d 1223 (10th Cir. 2010) ..................................................................................15

*Haaland v. Brackeen,*
599 U.S. 255 (2023)......................................................................................................9

*Kane Cnty. v. United States,*
928 F.3d 877 (10th Cir. 2019) ("*Kane III*")..................................................13, 14, 15

*Kane Cnty. v. United States,*
94 F.4th 1017 (10th Cir. 2024) ("*Kane IV*")..................................................4, 5, 13

*Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior,*
66 F.4th 282 (D.C. Cir. 2023)....................................................................................13

*Massachusetts v. EPA,*
549 U.S. 497 (2007)......................................................................................................9

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ..................................................................................9

*Oklahoma v. Castro-Huerta*,
   597 U.S. 629 (2022) ..................................................................................9

*San Juan County v. United States*,
   503 F.3d 1163 (10th Cir. 2007) ................................................................4

*Sierra Club v. Espy*,
   18 F.3d 1202 (5th Cir. 1994) ..................................................................15

*Texas v. United States*,
   805 F.3d 653 (5th Cir. 2015) ...............................................................4, 7

*Texas v. United States*,
   No. 18-68, 2018 WL 11226239 (S.D. Tex. June 25, 2018) .......................9

*Utah Ass'n of Cntys. v. Clinton*,
   255 F.3d 1246 (10th Cir. 2001) .....................................................4, 13, 14

*Va. House of Delegates v. Bethune-Hill*,
   587 U.S. 658 (2019) ..................................................................................5

*W. Energy All. v. Zinke*,
   877 F.3d 1157 (10th Cir. 2017) .........................................................5, 13

*WildEarth Guardians v. U.S. Forest Serv.*,
   573 F.3d 992 (10th Cir. 2009) .......................................................4, 8, 12

**Statutes**

18 U.S.C. § 922 ................................................................................................3

18 U.S.C. § 923 ................................................................................................3

Ariz. Rev. Stat. Ann. § 44-7852 ....................................................................11

Ariz. Rev. Stat. Ann. § 13-3109 ....................................................................11

Ariz. Rev. Stat. Ann. § 13-3118 ....................................................................11

Bipartisan Safer Communities Act, Pub. L. 117-159, 136 Stat. 1313 (2022) ...........................1, 3

Colo. Rev. Stat. Ann. §§ 18-12-112 ..............................................................11

Colo. Rev. Stat. Ann. § 18-12-501 ................................................................11

Colo. Rev. Stat. Ann. § 24-33.5-424 .............................................................11

Conn. Gen. Stat. §§ 29-36*l*..............................................................................11

Del. Code Ann. tit. 11, § 1448A .......................................................................11

N.J. Stat. Ann. § 2C:58-2 .................................................................................11

N.J. Stat. Ann. § 2C:58-3 .................................................................................11

**Other Authorities**

Erin G. Andrade et al., *Firearm Laws and Illegal Firearm Flow Between U.S.
States*, 88 J. TRAUMA & ACUTE CARE SURG. 752 (2020) .......................................10

DOJ, ATF, NATIONAL FIREARMS COMMERCE AND TRAFFICKING ASSESSMENT
(NFCTA): CRIME GUNS – VOLUME II (2023). ..........................................10

DOJ, ATF, NATIONAL FIREARMS COMMERCE AND TRAFFICKING ASSESSMENT
(NFCTA): CRIME GUNS – VOLUME III (2023) ..........................10, 11, 12

Fed. R. Civ. P. 24 ...........................................................................................5, 15

Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms, 89
Fed. Reg. 28,968 (Apr. 19, 2024) ............................................... *passim*

Brian Knight, *State Gun Policy & Cross-State Externalities: Evidence from Crime
Gun Tracing*, 5 AM. ECON. J.: ECON. POL'Y 200 (2013) ........................................10

Ellicott C. Matthay et al., *In-State and Interstate Associations Between Gun
Shows and Firearm Deaths and Injuries*, 167 ANNALS INTERNAL MED. 837
(2017)...........................................................................................................10

NRA, *President Donald J. Trump Speaks at 2024 NRA Presidential Forum in
Harrisburg, PA*, YOUTUBE (Feb. 10, 2024),
https://www.youtube.com/watch?v=v_RBnl1vIjs.................................................13

Gram Slattery, *Trump pledges to 'roll back' Biden gun rules, fire ATF chief at
NRA rally*, REUTERS (May 20, 2024), https://tinyurl.com/5n8asdf8 .....................13

Glenn Thrush, *A.T.F. Braces for a Likely Rollback of Its Gun-Control Efforts*,
N.Y. TIMES (Dec. 14, 2024), https://tinyurl.com/j385b7dc ..................................13

# INTRODUCTION

This case challenges a Final Rule that implements Congress's amendments to the Nation's firearms laws. Among other important changes, the Bipartisan Safer Communities Act expanded the category of firearm dealers who must go through a background-check process before they can sell firearms to a would-be customer, and who must retain records of those sales that federal, state, and local law enforcement can use to solve violent crimes and to go after straw purchasers and illegal gun traffickers. Because federal defendants can no longer be counted on to defend the Final Rule, and because elimination of the Final Rule would impose significant harms on Movant States, these 15 Movant States now move to intervene.[1]

The basis for intervention in this matter is straightforward. The challengers seek final relief that would prevent implementation of the Final Rule across the country, whether in the form of vacatur or an injunction. But granting that relief would work enormous harms to Movant States' interests, giving Movant States a right to intervene under Rule 24(a). As federal defendants have explained, absent the Final Rule fewer firearms dealers would obtain a federal license and be subject to Congress's recordkeeping requirements. Those records are critical in enabling the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to provide state and local law enforcement with important evidentiary leads to solve violent crime—and to go after straw purchasers and illegal gun traffickers. Without those records, state and local law enforcement will have to expend additional financial and law enforcement resources in order to solve the same violent crimes or engage in the same trafficking investigations—and worse still, will be unable to

---

[1] The Movant States seeking to intervene in this action are: New Jersey, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Maryland, Attorney General Dana Nessel on behalf of the People of Michigan, Minnesota, Nevada, North Carolina, Oregon, Rhode Island, Vermont, and Washington.

solve certain crimes, allowing some criminals to recidivate. Not only would the loss of the Final Rule harm Movant States' access to crime-solving information, it would also make it easier for potentially dangerous individuals to obtain firearms in the first place and for these individuals to do so without going through a background check. This profoundly harms Movant States' financial and quasi-sovereign interests—including the safety of their residents.

This Court and the Tenth Circuit have previously explained that, especially in cases that bear on the public interest, putative intervenors should be allowed to participate when participation would promote the greater justice and not harm existing parties. This motion satisfies that low bar easily. Given the overwhelming harms that Movant States would incur from an adverse judgment, their need to intervene is clear. Although the federal defendants were previously defending the Final Rule, there is little doubt that will now change: the President-Elect promised to rescind a series of ATF rulemakings during the 2024 presidential campaign, and cited this Final Rule explicitly. Without intervention, then, Movant States would have no party to represent their interests—and this Court would be deprived of any adequate defense of the Final Rule on the merits. Additionally, this intervention is neither belated nor premature: this dispute remains ongoing and this Court has not issued any final judgment; federal defendants will only now cease their defense of the Final Rule; and Movant States are prepared to litigate in each case challenging this Final Rule. This Court should allow them to intervene here and provide that defense.

## BACKGROUND

In light of this Court's prior order, ECF 164, describing the background and procedural history, Movants incorporate that information by reference and provide the following additional information relevant to Movant's interests in intervening in defense of the Final Rule.

Federal law requires that all those "engaged in the business" of selling firearms obtain a federal firearms license, and sets out basic safety measures all federal firearms licensees (FFLs) must follow, including a requirement to conduct background checks via the National Instant Criminal Background Check System ("NICS") before transferring firearms. *See* 18 U.S.C. § 922(d), 922(t); *Abramski v. United States*, 573 U.S. 169, 172–73, 181 (2014). Federal law also requires that federal licensees maintain records of their sales, and allows for the use of those records in a criminal investigation—including a gun trafficking investigation. *See* 18 U.S.C. § 923(g); *see also Abramski*, 573 U.S. at 173. But because loopholes allowed unlicensed dealers to bypass such requirements and sell firearms without running purchasers via NICS or maintaining any federally-required records of these sales, Congress expanded the number of dealers who must become FFLs, and therefore be subject to background-check and recordkeeping requirements, by broadening the GCA's definition of entities "engaged in the business" of dealing firearms. Bipartisan Safer Communities Act ("BSCA"), Pub. L. 117-159, 136 Stat. 1313, 1324-25 (2022).

Considering that statutory change, ATF proposed updating its regulations to reflect the new definition and to provide guidance—in light of the BSCA and prior court decisions—of some conduct that qualifies. Twenty States—including Movant States—filed a comment letter supporting the proposed rule because (1) the expansion of entities subject to the basic federal background-check requirements would "reduc[e] the number of guns transferred to prohibited persons" by "curtail[ing] the opportunities" for prohibited persons to avoid NICS, and (2) the rule assists state and local "law enforcement by ensuring that accurate and adequate records are kept for more transactions, providing them with the information they need to effectively inspect gun dealers, trace crime guns, prosecute gun charges, and help keep the communities they serve safe." Ex. 3 at 3 (Multistate Comment on Proposed Rule (Dec. 7, 2023)).

ATF published the Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Final Rule"), estimating that 25,563 to 95,505 previously unlicensed individuals would now require federal licensees, and therefore would be subject to the various requirements applicable to FFLs. *See id.* at 29,071–73. Because those entities are now subject to background check and recordkeeping requirements, the Final Rule will "help[] prevent firearms from being sold to felons or other prohibited persons, who may then use those firearms to commit crimes and acts of violence," *id.* at 29,085, and "help Federal, State, local, and Tribal law enforcement solve crimes involving firearms through crime gun tracing," *id.* at 28,988.

## ARGUMENT

## I.    MOVANT STATES ARE ENTITLED TO INTERVENE AS OF RIGHT.

Under Rule 24(a), a movant has the right to intervene where it "claims an interest relating to . . . the subject of the action" and the outcome of the suit might "impair or impede [their] ability to protect that interest"; the existing parties cannot or will not adequately represent movant's interest; and the motion is timely. *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 995 (10th Cir. 2009); *Kane Cnty. v. United States*, 94 F.4th 1017, 1030 (10th Cir. 2024) ("*Kane IV*") (same). Rule 24 should be "liberally construed" in favor of intervention, and courts accept the movant's factual allegations as true for resolving the motion. *Utah Ass'n of Cntys. v. Clinton*, 255 F.3d 1246, 1249 (10th Cir. 2001); *Texas v. United States*, 805 F.3d 653, 656–57 (5th Cir. 2015). The Tenth Circuit has repeatedly cited both its "'somewhat liberal line' and the intervenor's 'minimal burden'" under the Rule. *WildEarth Guardians*, 573 F.3d at 995. Said simply, "if an absentee would be substantially affected . . . by the determination made . . . [they] should, as a general rule, be entitled to intervene." *San Juan County v. United States*, 503 F.3d 1163, 1195 (10th Cir. 2007). Movant States easily satisfy that test.

4

**A.    Movant States Have Substantial Interests In Upholding The Final Rule.**

The Tenth Circuit has required an intervenor to have a "direct, substantial, legally protectable interest in the proceedings." *Coal. of Ariz./N.M. Cntys. of Stable Econ. Growth v. Dep't of the Interior*, 100 F.3d 837, 840–41 (10th Cir. 1996); *see also* Fed. R. Civ. P. 24(a)(2). An interest is protectable if it "would be impeded by the disposition of the action." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1165 (10th Cir. 2017). The Tenth Circuit has emphasized that courts will take a "liberal approach" and "relax[]" intervention requirements in cases "raising significant public interests." *Kane IV*, 94 F.4th at 1033–34. Movant States have a right to intervene here because the final relief the challengers seek, in this public interest case, would harm Movant States' interests in at least two ways: it would reduce the availability of records on which state and local law enforcement consistently rely to solve crimes, and it would increase prohibited persons' access to and use of guns in crime in Movant States.[2]

1. Because the invalidation of the Final Rule will make it more difficult for Movant States to solve gun crimes, thus imposing direct and substantial financial and quasi-sovereign burdens on Movant States, Movant States have a protectable interest in defending the Final Rule.

Invalidation of the Final Rule will reduce the number of entities that maintain firearms transaction records by anywhere from 25,563 to 95,505 dealers. Final Rule, 89 Fed. Reg. at 29,071–73. Thus, the disposition of this suit could make it harder for Movant States to solve crimes

---

[2] Beyond establishing sufficient interests to justify their Rule 24(a) intervention, Movant States do not also need to independently establish their Article III standing to intervene as defendants in this Court. As the Supreme Court has held, there is no need to establish standing where Movant States ask only that this Court reject Plaintiffs' claims. *See Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019) (defendant-intervenor need not establish Article III standing since its defense of redistricting plan did not "entail[] invoking a court's jurisdiction"); *see also Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179 (2022) (confirming legislative leaders may intervene to defend law without discussing standing).

involving firearms. Whenever state or local law enforcement recovers a firearm that was used in a crime, that firearm can provide important evidence as to the identity of the perpetrator, or help to identify gun trafficking networks that got the gun to the criminal. *See* Ex. 1 at 3-4. Where law enforcement can identify the manufacturer and serial number of the firearm, they can submit that information to ATF so that ATF can identify at least some previous retailers and purchasers of the weapon. *Id.* at 3-4; Ex. 2 at 3; *see also* Final Rule, 89 Fed. Reg. at 29,083 (noting "crime-gun tracing is one of the most valuable and effective services ATF provides to law enforcement agencies. . . in investigating crimes involving firearms"); *id.* (in FY2022, "the Department performed over 623,000 crime-gun traces. Of these, 27,156 were deemed 'urgent,' which included firearms used in criminal activities such as mass shootings, homicides, bank robberies, and other immediate threats to officer and public safety.").

The ease with which ATF can track the crime gun to prior purchasers and identify persons who may be the perpetrator of the crime, or involved as a straw-purchaser or member of an illegal firearms trafficking network, depends on whether the retailers involved were licensed and subject to GCA recordkeeping requirements. As the Final Rule explains:

> When a firearm is recovered in a criminal investigation and submitted for tracing, ATF is often able to identify the last known purchaser through records maintained by the licensee, providing crucial leads in the underlying criminal investigation. When a firearm is transferred by an unlicensed person, however, such records rarely exist and, if such records do exist, they are not accessible to ATF through the tracing system.

89 Fed. Reg. at 29,083; *see also id.* at 28,988 (noting "[u]nder the GCA, 'dealers must store, and law enforcement officers may obtain, information about a gun buyer's identity. That information helps to fight serious crime. When police officers retrieve a gun at a crime scene, they can trace it to the buyer and consider him as a suspect'" (quoting *Abramski*, 573 U.S. at 182)); *id.* at 29,083

(ATF can "determine the purchaser in 77 percent" of law enforcement's trace requests "[l]argely as a result of the records the GCA requires licensees to maintain."); *see also* Ex. 1 at 3-4 (N.J. declaration discussing experience with ATF tracing system); Ex. 2 at 2-4 (A.Z. declaration explaining same).

A court order invalidating the Final Rule, especially one with nationwide effect, would make it more difficult for ATF to provide helpful leads to state and local law enforcement that they could use in solving crime. ATF has confirmed that the Final Rule would "enhance the capacity of the Department to successfully complete crime-gun traces for law enforcement partners globally." 89 Fed. Reg. at 29,083; *see also id.* at 28,698, 28,988 (Because the Final Rule will help "more persons become licensed" and ensure "the transaction records maintained by those dealers will allow law enforcement to trace more firearms involved in crime and to apprehend more violent offenders who misuse firearms," the Final Rule "will help Federal, State, local, and Tribal law enforcement solve crimes involving firearms through crime gun tracing.").

That the Final Rule, by design, results in greater evidentiary leads to state law enforcement confirms that Movant States have a direct and substantial interest in its defense. For one, the States are important "intended beneficiaries" of the Final Rule and the GCA. *See Texas*, 805 F.3d at 658–69 (emphasizing that intended beneficiaries of a federal policy have a sufficient interest supporting intervention as of right where that policy is challenged, and collecting cases). In enacting the GCA, Congress found that its licensed dealer requirements—including its recordkeeping requirements— would aid state and local law enforcement in their fight against violent crime. *See supra* at 3. And the Final Rule repeatedly finds that the expansion of who must qualify as an FFL and the expansion of who must retain purchaser records serves state and local law enforcement by improving ATF's capacity to generate evidentiary leads. *See, e.g.*, 89 Fed. Reg. at 28,988 (agreeing Final Rule "will

help Federal, State, local, and Tribal law enforcement solve crimes involving firearms through crime gun tracing"); *see also id.* at 28,994 (highlighting the "crucial intelligence provided directly to law enforcement in their respective jurisdictions"); *id.* at 28,989 (same); *id.* at 29,063 (same); *id.* at 29,070 (same); *id.* at 29,083–85 (same). And that interest is substantial: asking ATF to trace a crime gun to generate leads, in order to identify suspects in a violent crime or to identify those who served as the perpetrator's straw purchaser or firearms trafficker, is a routine part of many state and local law enforcement investigations, and has repeatedly allowed law enforcement to solve crime—just as the GCA and Final Rule intend. *See* Ex. 1 at 3–4.

Movant States have other, financial interests that will likewise be impacted. *See Biden v. Nebraska*, 600 U.S. 477, 490 (2023). The Final Rule explains that increasing the number of dealers that retain firearms records allows ATF to provide evidentiary leads to state and local law enforcement officers who "can use this information to better target limited resources" to solve crime—including "to pursue illicit firearms traffickers." 89 Fed. Reg. at 28,989. The experience of state law enforcement bears this out: where trace records do not reveal a firearm's most recent purchaser, state officers must take additional investigative steps to identify the current owner. *See* Ex. 1 at 6–8. Those investigative steps can be burdensome—requiring law enforcement officers to conduct interviews and/or to cross state lines—demanding significant resources from the state agency. *See* Ex. 1 at 6. The invalidation of the Final Rule and concomitant loss of recordkeeping for a significant volume of firearms sales will increase state costs to solve violent crime and fight illegal trafficking. *See, e.g.*, *WildEarth Guardians*, 573 F.3d at 966.

Movant States also have related quasi-sovereign interests that support their defense of the Final Rule. *See*, *e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 603–04, 607 (1982) ("*Snapp*") (finding States have quasi-sovereign interests in the health and safety of

their residents, and the State can "represent and defend them");[3] *Texas v. United States*, No. 18-68, 2018 WL 11226239, at *1 (S.D. Tex. June 25, 2018). Indeed, few interests matter more to States than protecting residents from violence. *See, e.g.*, *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 651 (2022) (noting State's "strong sovereign interest in ensuring public safety and criminal justice within its territory" in preemption context). And when ATF is able to provide fewer evidentiary leads from a gun trace, it reduces the chance that state law enforcement can solve that crime—let alone find the traffickers or straw purchasers who facilitated the offense. *See* Ex. 1 at 4. If state law enforcement cannot trace the criminal offender or straw purchaser because the straw purchaser evaded the GCA recordkeeping system by approaching an unlicensed dealer, that straw purchaser and criminal will likely remain on the street and able to recidivate. *See* Ex. 1 at 8–9 (discussing dangers of recidivism); 89 Fed. Reg. at 29,063 (explaining that tracing data is "beneficial" to States in capturing straw purchasers and thus "help[s] law enforcement reduce criminal activities").

2. Movant States have a second protectable—and profound—interest in defending the Final Rule: elimination of the Final Rule will increase the tide of unlawful firearms within and into their borders, imposing direct and substantial financial and quasi-sovereign harms.

---

[3] Although Movant States acknowledge that "[a] State does not have standing as *parens patriae* to bring an action *against* the Federal Government" based upon these interests, *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (emphasis added) (quoting *Snapp*, 458 U.S. at 610 n.16 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923))), the so-called "*Mellon* bar" is no obstacle to a State's assertion of standing to *defend* federal action based on its quasi-sovereign interests in the health and well-being of its residents. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (explaining "critical difference between allowing a State to protect her citizens from the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)" (citations omitted)).

Elimination of the Final Rule will increase the trafficking and use of unlawful firearms in Movant States by increasing the number of firearms sales that do not involve background checks. Between 2017 and 2021, "the most frequent types of trafficking channels identified in ATF investigations were unlicensed firearm dealing"—at 40.7%.[4] Transactions in which the firearms purchaser does not undergo a background check have a shorter time-to-crime, suggesting the firearms "were rapidly diverted from lawful firearms commerce into criminal hands."[5] *See* 89 Fed. Reg. at 29,084 (describing how longer time-to-crime data indicates that having new licensees conduct purchaser background checks "will deter violent felons, traffickers, and other prohibited persons from obtaining firearms from those dealers").[6]

Elimination of the Final Rule will increase prohibited persons' access to firearms even in the States that maintain more stringent licensing requirements, given the nature of illegal interstate firearms trafficking.[7] Crime guns are rarely purchased at a retail firearm dealer just prior to their

---

[4] DOJ, ATF, NATIONAL FIREARMS COMMERCE AND TRAFFICKING ASSESSMENT (NFCTA): CRIME GUNS – VOLUME III, pt. 3, at 1–4 (2023) (hereinafter "NFCTA VOL. III").

[5] DOJ, ATF, NATIONAL FIREARMS COMMERCE AND TRAFFICKING ASSESSMENT (NFCTA): CRIME GUNS – VOLUME II, pt. 3, at 35 (2023).

[6] Studies estimate extending licensure requirements to these dealers will decrease trafficking of firearms into Movant States. *See* Brian Knight, *State Gun Policy & Cross-State Externalities: Evidence from Crime Gun Tracing*, 5 AM. ECON. J.: ECON. POL'Y 200, 224 (2013) (emphasizing regulations can "eliminate incentives for trafficking into this state"). Conversely, allowing traffickers to acquire firearms while avoiding background checks exposes Movant States to increased firearms trafficking. *See* Ex. 1 at 8.

[7] Indeed, for this reason, Movant States have little choice to intervene to defend the Final Rule, as they lack the power unilaterally to avoid these harms themselves. Even for Movant States that have adopted their own licensing requirements, given the above-discussed nature of interstate gun trafficking, a reduction in the scope of federally-mandated background checks across the country will have a direct impact on public safety within their borders. *See, e.g.*, Ellicott C. Matthay et al., *In-State and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries*, 167 ANNALS INTERNAL MED. 837, 842 (2017) (finding an association between Nevada gun shows and "cross-border increases in firearm injuries in California"); Erin G. Andrade et al., *Firearm Laws*

use in crime. Instead, many people who are prohibited from possessing a firearm turn to unlicensed dealers because they cannot pass a background check to legally purchase a gun from an FFL. These guns acquired by unlicensed dealing are frequently used in crimes, including shooting incidents. NFCTA VOL. III pt. 4, at 5 (reporting 368 cases where a firearm acquired from an unlicensed dealer was recovered in a shooting). While some states do strictly regulate the transfer of firearms under state law to require background checks, crime guns can still flow in from states that have little to no regulation of firearms transfers. *See* NFCTA VOL. III, pt. 3, at 1–4, *see* Ex. 1 at 6–10.[8]

Conversely, for Movant States with little to no regulation of firearms transfers other than under federal law, the Final Rule helps reduce the intrastate transfer of firearms to criminals. For example, Arizona law does not require background checks, permits, or the registration of firearms sold in private sales. *See, e.g.*, Ariz. Rev. Stat. Ann. §§ 44-7852, 13-3109(B), 13-3118. In other words, if a firearms sale in Arizona is not regulated by the GCA, it is not regulated at all. This makes it incredibly easy for criminals to purchase or obtain firearms from unlicensed dealers without documentation. According to ATF data, of the 39,771 crime guns recovered in Arizona between 2017 and 2021 and successfully traced to a known purchaser, the purchaser and the person who used the gun in a crime were the same individual in only 14% of cases.[9] Ex. 2 at 4. In Arizona

---

*and Illegal Firearm Flow Between U.S. States*, 88 J. TRAUMA & ACUTE CARE SURG. 752, 758 (2020) (concluding that "[s]tates with stricter firearm legislation are negatively impacted by the weaker regulations in other states, as crime guns are trafficked from out-of-state).

[8] This means that states like New Jersey which passed state laws that require every in-state transfer to go through a state licensed dealer are powerless to resolve this issue on their own. *See* N.J. Stat. Ann. § 2C:58-2, -3; *see also* Colo. Rev. Stat. Ann. §§ 18-12-112(2)(a), 18-12-501(1)(a), 24-33.5-424(3)(a); Conn. Gen. Stat. §§ 29-36*l*(f)(2); Del. Code Ann. tit. 11, § 1448A(a) (similar state laws). The nature of this problem demands a solution at the federal level.

[9] Of the 39,771 crime guns recovered in Arizona and traced to a known purchaser, the vast majority of those guns (32,771) were purchased within Arizona. *See* Ex. 2 at 5. Meaning the majority of crime guns recovered in Arizona were purchased in the state and later transferred without documentation to someone else within the state.

in particular, the trafficking of firearms presents an immense public safety risk. Indeed, the ATF Phoenix field division generated the highest percentage of trafficking investigations involving unlicensed dealers (14.0% of 3,404 investigations) and involving straw purchasers (14.1% of 3,305 investigations). NFCTA VOL. III, pt. 3, at 4. The Final Rule makes it more difficult for criminals to access firearms in Arizona, furthering the State's interest in public safety.

Movant States thus have substantial financial and quasi-sovereign interests in defending a federal regulation that ensures more firearms transfers will involve background checks. State law enforcement expends significant resources on investigating and prosecuting prohibited persons in possession of firearms that originate out of state that were acquired without background checks. *See* Ex. 1 at 6-8. Although the Final Rule would not eliminate all unlicensed dealing, requiring tens of thousands of new licensees to conduct background checks lowers the costs that the Movant States directly sustain related to crimes committed by prohibited persons that would be rejected by a simple background check. *See* Ex. 1 at 8–10.

Given the "possibility" that Movant States' interests in the expansion of recordkeeping and background checks enshrined in the Final Rule would be "impaired or impeded" by a court order in this case, *WildEarth Guardians*, 604 F.3d at 1199, Movant States maintain a right to intervene "to air their views so that a court may consider them before making potentially adverse decisions," the "very purpose of intervention." *Brumfield v. Dodd*, 749 F.3d 339, 345 (5th Cir. 2014).

### B.    Existing Parties Will No Longer Adequately Represent Movant States' Interests, And Movant States Timely Intervened In Light Of That Change.

This Court should allow Movant States to intervene to defend their interests because there are no longer parties adequately defending them, and because Movant States timely filed as soon as that representation become inadequate. As to the representation of Movant States' interests, they bear only a "minimal" burden at this step—to show that the representation by existing parties "*may*

be inadequate." *Kane IV*, 94 F.4th at 1030 (emphasis added). Although federal defendants were defending this Final Rule, and protecting Movant States' interests in it, that will change after the January 20, 2025 inauguration. The President-Elect has promised to quickly reverse the ATF rules adopted by the Biden Administration, even citing this Final Rule.[10] Because federal defendants will now likely seek elimination of this Final Rule, federal defendants can no longer adequately defend Movant States' interests in its survival. The change in Administration thus "raises the possibility of divergence of interest" and a "shift" in policy that makes the federal defendants' representation of Movants' interests "inadequate." *Kane Cnty. v. United States*, 928 F.3d 877, 894 (10th Cir. 2019) ("*Kane III*"); *W. Energy All.*, 877 F.3d at 1168–69. Federal defendants—despite "having started out as . . . all[ies]"—will be Movant States' "adversar[ies]," and not "faithful representative[s] of [Movant States'] interest." *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 66 F.4th 282, 285 (D.C. Cir. 2023).

    Intervention provides the precise solution for this problem: to ensure this Court has parties who are willing and well-suited to defend the Final Rule, and thus to ensure appropriate adversarial presentation on the merits and equities questions implicated here. Indeed, several courts have repeatedly allowed Movant States to intervene in precisely this sort of situation, authorizing them to provide the adequate defense the federal defendants would not. *See, e.g.*, *Utah Ass'n of Cntys.*,

---

[10] *See, e.g.*, Gram Slattery, *Trump pledges to 'roll back' Biden gun rules, fire ATF chief at NRA rally*, REUTERS (May 20, 2024), https://tinyurl.com/5n8asdf8 (noting "Republican presidential candidate Donald Trump pledged to unravel gun regulations put in place by Democratic President Joe Biden."); NRA, *President Donald J. Trump Speaks at 2024 NRA Presidential Forum in Harrisburg, PA*, YOUTUBE (Feb. 10, 2024), https://www.youtube.com/watch?v=v_RBnl1vIjs. And President-Elect Trump referenced ending the Final Rule when he "pointed to [current ATF Director Steven M.] Dettelbach's effort to expand background checks on weapons sold at gun shows, to include private kitchen-table gun sales and online firearms marketplaces," for particular criticism. Glenn Thrush, *A.T.F. Braces for a Likely Rollback of Its Gun-Control Efforts*, N.Y. TIMES (Dec. 14, 2024), https://tinyurl.com/j385b7dc.

255 F.3d at 1256 (noting that "it is not realistic to assume that the agency's programs will remain static or unaffected by unanticipated policy shifts"); *California v. Texas*, 593 U.S. 659, 668 (2021) (allowing States to intervene after a change in administration). This Court should do the same.

Movant States' intervention is also timely—as they are filing promptly upon their interests no longer being adequately represented in this case. *See Kane III*, 928 F.3d at 890–91 (outlining factors for deciding the timeliness of intervention)*; see also Utah Ass'n of Cntys.*, 255 F.3d at 1250 (same). Indeed, Movant States are filing this motion as soon as doing so became necessary, and denial of their motion would leave their interests unrepresented given the incoming change in Administration. By contrast, granting the motion would prejudice no party, and instead ensure adversarial presentation. *Utah Ass'n of Cntys.*, 255 F.3d at 1250 (noting courts should permit intervention "where no one would be hurt and greater justice could be attained"). Indeed, because federal defendants' interests will change after Inauguration on January 20, 2025, *see supra* at 13-14, Movant States have swiftly filed their papers, so that there will be a seamless transition from one government's defense of the Final Rule (federal defendants) to other governments with interests in it (Movant States).[11] "[T]he timeliness of [Movants States'] motion should be assessed in relation to that point in time," *i.e.*, when their "need to seek intervention . . . ar[o]se." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 280 (2022).

By contrast, granting Movant States' request to intervene would not prejudice the existing parties at all. Because Plaintiffs would retain the full benefit for the preliminary-injunction order

---

[11] Just as Movant States have not brought this motion to intervene too late (for timeliness purposes), Movant States have also not filed too early (for adequacy purposes)—because they are not required to wait until the incoming Administration in fact terminates its defense of this Final Rule. *Cook Cnty. v. Texas*, 37 F.4th 1335, 1342 (7th Cir. 2022). Even though Movant States may be justified in waiting to ascertain what position federal defendants will take after the change in administration before intervening in other cases, federal defendants' forthcoming position in *this* case is clear. *See supra* at 13-14.

regardless of the disposition of this intervention motion, Plaintiffs cannot contend that intervention would harm them. Instead, Movant States seek to continue defending the Final Rule after the anticipated abandonment by Defendants, including at the summary-judgment stage. *See Kane III*, 928 F.3d 877 (approving of intervention following change in presidential administration). It is similarly appropriate here.[12] This motion is timely, and would allow Movant States to provide a defense.

Finally, because Movant States satisfy the standard for mandatory intervention, this Court need not consider permissive intervention under Rule 24(b). But to the extent this Court reaches that issue, it should allow intervention under Rule 24(b). Such intervention is appropriate when the proposed intervenor can show: (1) the applicant "has a claim or defense that shares with the main action a common question of law or fact"; (2) the motion is timely; and (3) intervention will not delay or prejudice adjudication of the existing parties' rights. Fed. Rule Civ. P. 24(b)(1)(B), (b)(3). For the reasons articulated *supra*, that standard is easily met here. Not only would Movant States be able to defend the Final Rule absent a federal defense, but they can provide briefing on the impact of any decision on other States, and they can brief the impact on this litigation of a future decision by the ATF to reverse course and decide to rescind this Final Rule. Because Movant States satisfy the standard for permissive intervention, and would provide useful briefing to the Court, this Court should exercise its discretion to grant the motion to intervene.

## <u>CONCLUSION</u>

This Court should grant Movant States' motion to intervene as defendants.

---

[12] Nor is the possibility that Movant States will oppose a potential settlement between Plaintiffs and federal defendants prejudicial; "prejudice must be measured by the delay in seeking intervention, not the inconvenience of allowing the intervenor to participate in the litigation." *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994); *see also Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*, 619 F.3d 1223, 1232 (10th Cir. 2010).

Dated: January 16, 2025                        Respectfully submitted,

**NICOLE M. REVENAUGH**                        **MATTHEW J. PLATKIN**
*Specially Designated Local Counsel*           *Attorney General, State of New Jersey*
                                               JEREMY M. FEIGENBAUM*
                                               *Solicitor General, State of New Jersey*
By: /s/ Nicole M. Revenaugh

                                               By: /s/ Monica E. Finke
Nicole M. Revenaugh, #25482
Irigonegaray & Revenaugh
1535 SW 29th Street                            Monica E. Finke**
Topeka, KS 66611                               Deputy Attorney General
(785) 267-6115 ph.                             New Jersey Attorney General's Office
(785) 267-9458 fax                             124 Halsey Street, 5th Floor
nicole@itrlaw.com                              Newark, New Jersey 07101
                                               (609) 696-5363
                                               Monica.Finke@law.njoag.gov
                                               **Pro Hac Vice* Pending

                                               *Attorneys for State of New Jersey*


**KRISTIN K. MAYES**                           **PHILIP J. WEISER**
Attorney General of Arizona                     Attorney General of Colorado
By: /s/ Emma H. Mark
Hayleigh S. Crawford*
Deputy Solicitor General                        By: /s/ Shannon Stevenson
Emma H. Mark*
Assistant Attorney General                      Shannon Stevenson*
Office of the Arizona Attorney General          Solicitor General
2005 N. Central Ave.                            Office of the Colorado State Attorney
Phoenix, Arizona 85004                          General
(602) 542-3333                                  1300 Broadway, Denver, CO 80203
Hayleigh.Crawford@azag.gov                      (720) 508-6000
Emma.Mark@azag.gov                              Shannon.Stevenson@coag.gov
ACL@azag.gov

                                               *Attorneys for the State of Colorado*
*Attorneys for the State of Arizona*

16

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ James M. Belforti*

James M. Belforti*
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06105
(860) 808-5450
james.belforti@ct.gov

*Attorneys for State of Connecticut*


**ANNE E. LOPEZ**
Attorney General of Hawai'i

By: */s/ Thomas J. Hughes*

Thomas J. Hughes*
Deputy Solicitor General
Department of the Attorney General, State of Hawai'i
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
Thomas.J.Hughes@hawaii.gov

*Attorneys for State of Hawai'i*


**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*

Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for State of Delaware*


**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Jessica M. Finberg*

Jessica M. Finberg*
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6921
jfinberg@oag.state.md.us

*Attorneys for State of Maryland*

17

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Adam R. de Bear*

Adam R. de Bear*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 335-7573
debeara@michigan.gov

*Attorneys for Attorney General Dana Nessel*
*on behalf of the People of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Liz Kramer*

Liz Kramer*
Solicitor General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010
liz.kramer@ag.state.mn.us

*Attorneys for State of Minnesota*

**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*

Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorneys for State of Nevada*

**JEFF JACKSON**
Attorney General of North Carolina

By: */s/ Daniel P. Mosteller*

Daniel P. Mosteller*
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Attorneys for State of North Carolina*

**DAN A. RAYFIELD**
Attorney General of Oregon

By: */s/ Brian Simmonds Marshall*

Brian Simmonds Marshall*
Oregon Bar No. #196129
Senior Assistant Attorney General
Trial Attorney
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Brian.S.Marshall@doj.oregon.gov

*Attorneys for State of Oregon*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Sarah W. Rice*

Sarah W. Rice*
Deputy Chief, Civil Division
Office of the Rhode Island Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 x2054
srice@riag.ri.gov

*Attorneys for State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By:  */s/ Jonathan T. Rose*

Jonathan T. Rose*
Solicitor General
Rosemary M. Kennedy*
Assistant Attorney General
109 State Street
Montpelier, VT 06509
(802) 828-3171
jonathan.rose@vermont.gov
rosemary.kennedy@vermont.gov

*Attorneys for State of Vermont*

*\*Pro Hac Vice* Motions Forthcoming

**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ William McGinty*

William McGinty*
Assistant Attorney General
Washington State Office of the Attorney General
P.O. Box 4011
Olympia, WA 98504-0111
(360) 709-6027
William.McGinty@atg.wa.gov

*Attorneys for State of Washington*